No. 86,641

STATE OF KANSAS, *Appellee*, v. DEANNA C. WIGGETT, *Appellant*.

(44 P.3d 381)

Opinion filed April 19, 2002.

*Roger L. Falk*, of Law Office of Roger L. Falk, P.A., of Wichita, argued the cause and was on the briefs for appellant.

*Richard A. Olmstead*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Deanna C. Wiggett, from her convictions for attempted kidnapping, battery, and aggravated burglary. She was sentenced to a controlling term of 68 months. The charges against Wiggett arose after she approached a young mother in a store parking lot in Wichita, Kansas, sprayed her twice with pepper spray, knocked her to the ground, and attempted to take her infant daughter from a car seat in the rear seat of the mother's car.

Following the suggestion of her own mother, Wiggett went to the Toys-R-Us store in Wichita on June 27, 2000, to pick up a baby book to have ready for the expected birth of Wiggett's daughter. Wiggett approached Kristen Downing, a first-grade teacher, and Downing's two children in the Toys-R-Us parking lot. Downing had observed Wiggett in the parking lot before she entered the

store and testified that Wiggett appeared to be pregnant. After shopping for 20 or 30 minutes, Downing and her children left the store to return to their car. Downing had carried her daughter T.D., who was almost 6 weeks old, in an infant carrier. After Downing returned to her car, she opened the rear passenger door and her 4-year-old son Z.D. jumped in first. Then Downing began to latch T.D.'s baby carrier into the car seat.

Downing testified:

"About that time I felt someone tap me on my shoulder, and I started to turn around, and I heard her say, Ma'am, someone hit your car while you were—I think she was starting to say while I was in the store or something, and then I—I turned around to face her, and at that point she sprayed me in the face and then pushed me towards the back of the car where I—I landed on all fours. And I remember looking back up over my shoulder and seeing someone tug at the car seat, trying to pull the car seat out, and then I remember hearing my son screaming, and—and I thought . . . someone's trying to carjack my car, and my kids are in it."

Downing ran at Wiggett and struggled to lodge herself between Wiggett and the children, yelling, "No." Wiggett sprayed her again with pepper spray, and Downing said she "started yelling for someone to help me because she was trying to take my baby." At that point, Wiggett ran to a green vehicle and left in it.

Officer Shek Weber told jurors that he and his wife, Debra, had known Wiggett for 2 years and that Wiggett was a bridesmaid in their May 1999 wedding. Debra and Wiggett were good friends with Kristi Hulse. Debra, Hulse, and Wiggett's sister-in-law all had babies in 1999. According to Officer Weber, all the girls were pregnant at about the same time, except for Wiggett.

Jason Dunn, Debra's brother from New Jersey, came to Wichita for Debra's wedding on May 15 and returned to Wichita again on June 28, 1999, to help his family because their home was damaged by a tornado. Dunn began dating Wiggett after his arrival in June. In early September, Dunn returned to Trenton, New Jersey. At some time before Dunn left, Wiggett told him that she might be pregnant and that she planned to see a doctor to confirm her pregnancy. After Dunn returned to New Jersey, Wiggett told him she was, in fact, pregnant. Dunn continued to talk with Wiggett by

telephone, and during their calls they discussed sonograms and the progress of the baby. In March 2000, Wiggett told Dunn the sonogram showed the baby was a girl. Up to the time of Wiggett's arrest for this incident, Dunn believed Wiggett was pregnant and would have a baby sometime around the end of June 2000.

Officer Weber testified that Wiggett told all her family members and friends that she was pregnant. Debra gave Wiggett some of her maternity clothes to wear.

Wiggett's mother Carol testified that Wiggett lived at home with her parents and attended nursing school. From May 1999 to June 2000, she observed physical changes in Wiggett's appearance. She thought she felt the baby move and believed her daughter was pregnant.

After Carol asked Wiggett several times whether the doctor would perform a sonogram, Wiggett showed Carol a sonogram picture of a baby with the word "girl" written on it. Carol said that she and her husband redecorated a room in their house for the baby.

On June 27, 2000, as Carol, her husband, and Wiggett watched the 10 p.m. news, they saw a news broadcast about the incident at Toys-R-Us that described a green teal Honda. Carol testified, "Roger and I were kind of sitting across from each other, and we just looked at each other, then we looked at [Wiggett], and she just burst out in tears. She told us that it was her."

When Carol asked Wiggett why she did it, Wiggett replied that she lost the baby at 8 months. Carol's husband called Hulse, Officer Weber, and Debra and asked them to come over. They asked Weber how Wiggett should turn herself into police. Hulse, Debra, and Carol went to Wiggett's room to try to determine what happened, and they found itemized bills from The Center for Reproductive Medicine, in Wichita, and photographs of a sonogram reproduced at Wal-Mart. Upon examining the pictures closely, Debra and Hulse realized that the sonogram was actually a picture of Hulse's baby girl. A few weeks later, Carol learned that Wiggett did not have a miscarriage at 8 months and, in fact, had not been pregnant.

Joleen Zivnuska, a nurse practitioner at The Center of Reproductive Medicine, stated that she had seen Wiggett as a patient

from September 1999 through June 26, 2000. On October 10, 1999, Wiggett was inseminated with donor sperm for the first time. Wiggett received a total of 11 inseminations over the next 6 months. In May 2000, Wiggett was given a prescription for clomiphene citrate, a fertility medication. Zivnuska confirmed that Wiggett did not appear for her June 29, 2000, appointment, 2 days after the incident in the Toys-R-Us parking lot.

Dr. Douglas Mould, an expert psychologist for the defense, found Wiggett's symptoms consistent with the mental disorder pseudocyesis, also known as false or hysterical pregnancy. Mould testified that in his opinion Wiggett was in a dissociative state and was not capable of forming criminal intent when the incident took place.

Dr. William Levine, a psychiatrist, testified as a rebuttal witness on behalf of the State. Levine stated that it was possible Wiggett suffered from pseudocyesis, but concluded that, apart from Wiggett's own statements, the evidence did not show that Wiggett suffered from a mental disorder at the time of the offense.

Prior to trial, defense counsel filed a motion attacking the sufficiency of the affidavit of probable cause. On July 26, 2000, a hearing was conducted on the motion by Judge Rebecca Pilshaw. Defense counsel contended that the unlawful interference with parental custody statute more specifically described the crime committed by Wiggett and was a lesser included crime of kidnapping. Therefore, the defense contended that the probable cause affidavit did not support the charge of kidnapping. Judge Pilshaw found that the "taking" required in the interference statute did not necessarily involve the element of force required in kidnapping. Therefore, she denied the motion.

During the trial, defense counsel filed a motion for judgment of acquittal, asserting that the evidence adduced at trial was insufficient to support the jury's finding of guilt as to the attempted kidnapping charge. Judge Malone overruled the motion. After the trial, defense counsel renewed the motion for judgment of acquittal and also filed a motion for a new trial, contending that the arrest affidavit was insufficient, that the trial court failed to properly in-

struct the jury, and that the trial court erred by denying defense counsel's motions for judgment of acquittal made during the trial.

Judge Malone conducted a hearing on post-trial motions and sentencing proceedings. Judge Malone found that both parental interference and kidnapping involved a taking or confining, but that kidnapping required the use of force while interference did not, which made the two crimes distinct. Therefore, he overruled the motion for judgment of acquittal and the motion for a new trial.

For her first assertion of error, Wiggett argues that the trial court erred when it overruled her motion to dismiss the attempted kidnapping charge filed against her, and when it overruled her succeeding motions for judgment of acquittal concerning the same charge.

"In ruling on a motion for judgment of acquittal, if a trial judge concludes from the evidence that a reasonable mind might fairly decide a defendant is guilty beyond a reasonable doubt, the motion must be denied and the case must go to the jury. On appeal, the reviewing court must decide whether a rational factfinder could have found the accused guilty without a reasonable doubt. [Citation omitted.]" *State v. Valdez*, 266 Kan. 774, 784, 977 P.2d 242 (1999).

The standard of review on a motion for a judgment of acquittal in a criminal case is sufficiency of the evidence. *State v. Juiliano*, 268 Kan. 89, 95, 991 P.2d 408 (1999); *State v. Wilkins*, 267 Kan. 355, 365, 985 P.2d 690 (1999).

The crime of attempt is defined as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3301(a).

Kidnapping is defined as follows:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:
"(a) For ransom, or as a shield or hostage;
"(b) to facilitate flight or the commission of any crime;
"(c) to inflict bodily injury or to terrorize the victim or another; or
"(d) to interfere with the performance of any governmental or political function." K.S.A. 21-3420.

The crime of interference with parental custody is defined as "leading, taking, carrying away, decoying or enticing away any child under the age of 16 years with the intent to detain or conceal such child from its parent, guardian, or other person having the lawful charge of such child." K.S.A. 21-3422(a).

The crime of interference with parental custody may be accomplished in several ways. The perpetrator may lead the child away, physically take or carry the child away, or decoy or entice the child away. The removal of the child from his or her parent or lawful custodian must be accomplished with the specific intent to detain or conceal the child. There is no requirement that the taking be accomplished by force or deception. See K.S.A. 21-3422; PIK Crim. 3d 56.26.

*State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976), is instructive. There, kidnapping was defined as " 'to take and carry away any person by unlawful force or by fraud, and against his will.' [Citation omitted.]" 219 Kan. at 209 (quoting *State v. Brown*, 181 Kan. 375, 388, 312 P.2d 832 [1957]). In addition, the kidnapping statute was construed to require no particular distance of removal or time or place of confinement. 219 Kan. at 214. The *Buggs* court, however, qualified that construction by stating:

"Our statute requires that the taking or confinement be accomplished not only by the proscribed means (*i.e.*, 'by force, threat or deception') but also with the specific intent to accomplish one of four types of objectives. . . .

"We are concerned here with the second type of intent, *i.e.*, to hold the victim '(b) to facilitate . . . the commission of any crime.' . . . Under our statute a taking is a kidnapping if its purpose *is* to 'facilitate' the commission of any crime, even if the crime facilitated be a less serious crime such as robbery or rape.

". . . To be kidnapping, therefore, the taking need not be *necessary* to the accomplishment of the underlying crime, but it must be aimed at making it at least 'easier.' " 219 Kan. at 214-15.

The *Buggs* court further explained that "[t]he completed crime of robbery is thus the 'taking' of property from the person by the proscribed means; an 'attempt' to commit robbery occurs only when the taking is not accomplished." 219 Kan. at 206.

In this case, an attempt to kidnap a person would only have occurred when the taking was not accomplished. The State was not

required to prove that a taking occurred. Rather, the State was required to show that Wiggett committed an overt act toward the perpetration of kidnapping the baby and acted with the specific intent to facilitate the commission of a crime.

Wiggett believes that her actions constituted a single attempted taking and that under the *Buggs* holding, a single taking cannot support both the attempted kidnapping charge and the underlying charge of interference with parental custody. Wiggett's argument arises from the portion of *Buggs* where this court stated:

"[Our] kidnapping statute is not reasonably intended to cover movements and confinements which are slight and 'merely incidental' to the commission of an underlying lesser crime. . . . In the light of our statute, however, we cannot agree that merely because a taking 'facilitates' another crime it must necessarily be 'merely incidental' to the other crime. Whether a taking substantially 'facilitates' another crime or whether it is 'merely incidental' are two different things. *The same taking cannot be both.*" (Emphasis added.) 219 Kan. at 215.

The *Buggs* court sought to define and distinguish the "taking" requirement of a kidnapping from the incidental movement that often occurs during a robbery or a rape. There, the court concluded:

"[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

"(a) Must not be slight, inconsequential and merely incidental to the other crime;

"(b) Must not be of the kind inherent in the nature of the other crime; and

"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

Here, Wiggett broadly characterizes the taking necessary for the commission of both crimes as one continuous action. Wiggett argues that under the *Buggs* analysis, the one attempted taking cannot constitute both the taking element of a kidnapping and the taking element of the underlying crime. If we were to accept this characterization, however, it would be impossible for any person who forcibly abducts a child for the purpose of keeping the child permanently to commit a kidnapping.

"[C]riminal statutes must be strictly construed in favor of the accused. Any reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute. The rule of strict construction, however, is subordinate to the rule that judicial interpretation must be reasonable and sensible to effect legislative design and intent. [Citations omitted.]" *State v. Vega-Fuentes*, 264 Kan. 10, 14, 955 P.2d 1235 (1998).

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932). The crime of kidnapping requires the element of taking by force, and that force is not inherent in the nature of the crime of interference with parental custody. In addition, kidnapping does not require that a perpetrator act with the intent to detain or conceal a child from his or her parent and does not require that a victim be under 16 years of age.

Here, once the child was taken by force from her mother, Wiggett intended to take the child elsewhere, permanently removing the child from the custody of her parents while concealing her identity. Wiggett told Dr. Mould that when she went into the store and saw Downing and her baby girl, she thought to herself that could have been her, and then she thought she could take the baby and it would be hers. Thus, the actions of Wiggett, although never brought to fruition, may be separated into (1) a taking with force intended to facilitate a crime and (2) the permanent nonforceful removal of a child under 16 years of age from her legal custodians with the intent to detain or conceal the child.

Although Wiggett was unsuccessful, her use of force in an attempt to remove the child from her mother was neither slight, inconsequential, nor incidental to the commission of interference with parental custody. Furthermore, Wiggett's violent attack on Downing was not of the kind inherent in the nature of the underlying crime. Because the underlying crime did not require the use of force, Wiggett's attack on Downing has significance independent of the nonforceful taking or separation requirement of interference with parental custody.

We find there is sufficient evidence for a rational factfinder to find Wiggett guilty beyond a reasonable doubt of attempted kidnapping. Therefore, the trial court did not err in overruling Wiggett's motion to dismiss the attempted kidnapping charge or her motions for judgment of acquittal.

For her second assertion of error, Wiggett claims that the trial court erred in failing to instruct the jury on several lesser included offenses. Wiggett contends that the crimes of (1) attempted aggravated interference with parental custody; (2) attempted interference with parental custody; and (3) attempted criminal restraint may all be classified as lesser included offenses of attempted kidnapping. The issue before us is whether Wiggett was entitled to instructions on these three offenses.

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Mitchell*, 269 Kan. 349, 355, 7 P.3d 1135 (2000).

"Whether a crime is a lesser included offense is a question of law over which we have unlimited review. [Citation omitted.]" *State v. Belcher*, 269 Kan. 2, 4, 4 P.3d 1137 (2000).

"The trial court has the duty to instruct the jury not only as to the crime charged in the information, but also as to such lesser offenses included therein as may be justified by the evidence." *State v. Evans*, 219 Kan. 515, 517, 548 P.2d 772 (1976). "If evidence at trial merits a lesser included offense instruction, 'a court is under an affirmative duty to give an instruction on a lesser included offense . . . even if a defendant fails to request it. [Citation omitted.]' " *State v. Orr*, 262 Kan. 312, 336, 940 P.2d 42 (1997) (quoting *State v. Southerland*, 248 Kan. 96, 101, 804 P.2d 970 [1991]).

Here, Wiggett was charged with attempted kidnapping, aggravated battery, and aggravated burglary. The aggravated battery and aggravated burglary charges are not at issue. Furthermore, Wiggett concedes that the physical acts which gave rise to the charges actually occurred. Wiggett's brief states: "[T]he Defendant never de-

nied the physical acts which gave rise to the charges against her. Instead she presented a psychological defense, alleging that by reason of mental disease or defect, she was incapable of forming the required criminal intent. In the alternative, Defendant argued that she was 'overcharged.' "

The State maintains that since the elements of the crimes of attempted or aggravated interference with parental custody are not identical to some of the elements of kidnapping, neither is a lesser included offense of attempted kidnapping. Second, the State contends that the evidence excluded a theory of guilt on the lesser included offense of criminal restraint. First, we turn to aggravated interference with parental custody and attempted interference with parental custody to determine whether these offenses are lesser included crimes of attempted kidnapping.

K.S.A. 2001 Supp. 21-3107 states:

"(1) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment.

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both. A lesser included crime is:

(a) A lesser degree of the same crime;

(b) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged;

(c) an attempt to commit the crime charged; or

(d) an attempt to commit a crime defined under subsection (2)(a) or (2)(b)."

As discussed previously, the elements of interference with parental custody are not identical to some of the elements of kidnapping. Both crimes require a taking, but kidnapping requires a forceful taking. Further, kidnapping does not necessarily involve a victim under 16 years of age and does not require that the perpetrator act with the intent to detain or conceal the child victim from his or her legal custodian. Because these crimes require different elements, conduct constituting interference with parental custody cannot be equated with an attempt to commit a kidnapping or a lesser degree of kidnapping. Therefore, we hold that neither attempted interference with parental custody nor aggravated inter-

ference with parental custody is a lesser included offense of attempted kidnapping.

We now turn to Wiggett's claim of error as to the trial court's refusal to instruct the jury on criminal restraint. "Criminal restraint is knowingly and without legal authority restraining another person so as to interfere substantially with such person's liberty." K.S.A. 21-3424(a).

Previously, in *State v. Timms*, 29 Kan. App. 2d 770, 31 P.3d 323 (2001), we compared the crime of criminal restraint with kidnapping. There we stated:

"Ordinarily, criminal restraint is a lesser included offense of kidnapping. [Citations omitted.] When there is a factual question as to whether a defendant had the specific intent required to prove kidnapping, an instruction on criminal restraint is warranted. See *State v. Carter*, 232 Kan. 124, 126, 652 P.2d 694 (1982).

. . . .

"The key difference between kidnapping and criminal restraint is that kidnapping requires specific intent and criminal restraint does not." 29 Kan. App. 2d at 774.

The State contends that here the trial court did not challenge the legal conclusion that criminal restraint is a lesser included offense of kidnapping but, instead, based on Wiggett's admissions, decided that the evidence excluded the crime of criminal restraint. The State cites *State v. Carter*, 232 Kan. 124, 652 P.2d 694 (1982), where the defendant argued he lacked the capacity to commit the crime of kidnapping because of voluntary intoxication. There, this court held that unlawful restraint was a lesser included offense of the crime of kidnapping, but also noted:

" 'The rule is well established that the duty to instruct on lesser included crimes arises only when there is evidence under which the defendant might have reasonably been convicted of the lesser offense. [Citations omitted.] Thus, if the evidence offered excludes a theory of guilt on a lesser included offense, the instruction need not be given. [Citations omitted.]' " 232 Kan. at 125-26.

The question here is whether the evidence presented excludes a theory of guilt on criminal restraint. See *State v. Spresser*, 257 Kan. 664, 672, 896 P.2d 1005 (1995). If there was no factual question as to whether Wiggett acted with the specific intent to take the Downing baby to facilitate the commission of a crime, then the

theory of guilt for criminal restraint would be ruled out. See *State v. Dunn*, 223 Kan. 545, 548, 575 P.2d 530 (1978) (concluding that the evidence presented did not require an instruction on the lesser offense of unlawful restraint).

Here, the trial court noted that the evidence was uncontroverted that Wiggett's actions in the parking lot were done with force and concluded that the jury should either find her guilty or not guilty of attempted kidnapping.

The evidence presented in this case shows that Wiggett acted with specific intent, unnecessary for criminal restraint, but required for the crime of kidnapping. "As in *Timms*, ·[t]his case involved more than just grabbing someone's arm and delaying them or blocking someone's path to prevent them from leaving." *Timms*, 29 Kan. App. 2d at 774. Wiggett readily admitted to family, friends, and the police that she fabricated a story to distract Downing, sprayed her face with pepper spray, knocked her down, and then tried to pull the baby's car seat out of the vehicle. Wiggett's own admissions establish that she attempted to forcefully take the baby from Downing so that she could keep the baby as her own.

After reviewing the record, we conclude that a jury could not reasonably convict Wiggett of criminal restraint, even if instructed on the same as a lesser included offense. Therefore, the court did not err in refusing to give the requested instructions.

For her final assertion of error, Wiggett contends that her convictions should be set aside because of overwhelming evidence that she was in a dissociative state on June 27, 2000, in the parking lot of Toys-R-Us. According to Wiggett, the evidence presented was insufficient to support the finding that she had the required criminal intent or state of mind at the time of her conduct.

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999).

Dr. Mould testified as an expert witness for Wiggett. Mould initially performed a psychological assessment of Wiggett in preparation for a bond hearing and later provided counseling to her.

Mould learned that Wiggett still believed she was pregnant, even though she was receiving the inseminations, and found her symptoms consistent with the mental disorder pseudocyesis, also known as false or hysterical pregnancy. Mould testified that in his opinion, Wiggett was in a dissociative state and was not capable of forming criminal intent when the incident took place.

Dr. Steven Zielke, a board-certified obstetrician and gynecologist, testified for the defense that Wiggett's inability to ovulate in May and June was one symptom that would be consistent with a diagnosis of pseudocyesis, but did not testify as to her psychological condition.

Janis Roberts, a registered nurse who was married to Wiggett's cousin, testified that she saw Wiggett at Toys-R-Us between 3 and 4 p.m. on June 27, 2000. When Roberts tried to start a conversation, she reported that Wiggett acted strangely. "It's like I was talking to her but she wasn't really responding or grasping what I was saying to her. It's like she wasn't—she was there physically, but not in reality." Roberts was concerned and later went looking for Wiggett but could not find her in the store.

Dr. William Levine, a psychiatrist, testified as a rebuttal witness on behalf of the State. Levine stated that it was possible Wiggett suffered from pseudocyesis, but said he could not confirm or reject that diagnosis. Levine concluded that, apart from Wiggett's own statements, the evidence did not show that Wiggett suffered from a dissociative state or mental disorder at the time of the offense. Rather, Levine believed Wiggett suffered from an antisocial personality disorder and acted impulsively on the date of the incident without thinking of the consequences of her actions. Levine testified that he believed it was still possible for a person in a dissociative state to form criminal intent.

We will not reweigh the evidence. Levine testified that he did not believe Wiggett was in a dissociative state at the time of the incident. Further, even if the jury chose to believe Mould's assertion that Wiggett was in a dissociative state, Levine testified that he thought such a person could still form criminal intent. Considering the evidence in the light most favorable to the State, we find there was sufficient evidence for the jury to find beyond a reason-

able doubt that Wiggett had the required criminal intent or state of mind at the time of her conduct. Thus, Wiggett's final claim of error fails.

Affirmed.