(46 P.3d 570)
No. 85,731

STATE OF KANSAS, *Appellee*, v. GERRY A. BURDEN, *Appellant*.

Opinion filed May 24, 2002.

*Mary Curtis*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for appellant.

*Richard A. Olmstead*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before LEWIS, P.J., PIERRON and BEIER, JJ.

BEIER, J.: Gerry A. Burden appeals following his jury trial convictions of aggravated kidnapping, rape, aggravated criminal sodomy, and criminal threat. He raises four issues: (1) whether the district court erred in failing to remove potential jurors for cause; (2) whether the evidence supporting his aggravated kidnapping conviction was sufficient; (3) whether the instruction on criminal threat was misleading and denied him a unanimous verdict; and (4) whether prosecutorial misconduct requires reversal and a new trial.

Analysis and resolution of Burden's claims necessitate a brief review of the underlying facts and procedural history.

The victim, C.G., relayed the following story on the night of the crimes: Her boyfriend, Burden, accused her of infidelity. While she was going to the bathroom, he began hitting her in the face and head with a closed fist. Burden then stripped her and flushed her panties down the toilet. When C.G. ran from the bathroom,

Burden caught her as she was reaching the back door. He grabbed her by the hair, put his arm around her neck, and dragged her back through the house to the bedroom, where he threw her onto the bed, choked her, hit her several more times, and threatened to kill her. Specifically, he said: "I wasn't through with you," and "I'm going to kill you." He also stated that he knew he "was going to jail for this," but he did not care. Burden eventually demanded that C.G. get up and get dressed. He then held onto the back of her shirt, directing her out the back door. Once outside, she was able to break away and run to a neighbor's house for help.

That night, investigating officers went to the house and found Burden lying on the bed, smoking a cigarette. Before they asked him for anything other than his identification, Burden said, "She was like that when I got here; I didn't touch her."

Three days after the crimes, a police detective interviewed C.G. again, this time on a videotape eventually played for the jury at trial. For the first time, she added an allegation that Burden had penetrated her vagina and anus with his fingers while she and Burden were in the bathroom. She also said he had wiped his fingers on a sweatshirt he had taken off of her.

C.G. underwent a sexual assault exam immediately after the videotaped interview. The nurse who performed the exam ultimately testified that C.G. had bruises on her body and a bleeding lip. She also had a red mark on the cervix approximately 5 inches from the vaginal opening and corresponding redness on her labia and outer vaginal area. Although the speculum used in the exam could have caused the red mark on the cervix, the nurse said, a finger inserted in the vagina also could normally touch the cervix. The nurse concluded C.G.'s injuries were consistent with her version of events.

The sweatshirt C.G. had described to the detective was obtained from the house. Stains on the sweatshirt tested positive for feces.

At trial, C.G. attempted to retract her previous statements, saying she had made up most of what she told the police the night of the crimes and 3 days later. She said Burden did not threaten to kill her, chase her through the house, or digitally penetrate her. She explained that she had made these accusations only to get him into trouble.

Burden also testified at trial. He admitted to slapping C.G., but he denied that anything else happened. The prosecutor asked Burden if he had been convicted of domestic violence battery in 1998, and Burden acknowledged he had. During Burden's testimony, defense counsel measured Burden's middle finger and put into evidence that it was 3 inches long.

During voir dire, one prospective juror named Ms. W. told defense counsel that she thought she would have difficulty with the case because her father used to beat her mother. When asked if she could be fair, she replied: "[I]t would be a very emotional time to be sitting through it."

Defense counsel passed the panel for cause with the exception of four jurors, including Ms. W., and the following exchange took place between the district court and Ms. W. after a bench conference:

"THE COURT: Ladies and gentlemen of the panel, we've had a discussion up here at the bench and there is some concern whether there's some legal cause to challenge one or more of you. A couple of people have asked to discuss it privately; the other two have not.

"Ms. [W.], I want to address you. You've indicated that this would be an emotional issue. You don't think you could be fair and impartial. Could you explain that a little more.

"MS. [W.]: It just brings up things from my past that's so hard as I was sitting here. It's hard to talk about, but I just don't know how I feel about sitting through what she has commented about, what we — we're going to be hearing, you know.

"THE COURT: I understand. Ma'am, the real question is — and I appreciate it could be a difficult process for you to sit as a juror in this case. But the real question is, are you going to blank out what's said on the witness stand? Are you going to think about your experience or are you going to be able to listen to the evidence even though it may be difficult for you to be able to listen to evidence and make your decision based upon the evidence in this case in this courtroom and not on your past experiences?

"MS. [W.]: Yes.

"THE COURT: Okay. I'm going to deny challenge against Ms. [W.]."

The prosecutor also asked the court to permit further examination of potential jurors Mr. P. and Ms. C.; however, the district court and both attorneys specifically noted that no motion had been made to excuse either of them for cause. Further examination revealed that both had undergone personal experiences dealing with

a rape and had potential biases, but the district court found there was no reason to dismiss for cause.

Burden used 3 of his 12 peremptory challenges to strike Ms. W., Mr. P., and Ms. C.

The district court gave the following criminal threat jury instruction:

"The defendant, Gerry A. Burden, is charged in Count Four with criminal threat. The defendant, Gerry A. Burden, pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1.   That the defendant, Gerry A. Burden, threatened to commit violence;

"2.   That such threat was communicated with the intent to terrorize C.A.G.; and

"3.   That this act occurred on or about the 15th day of January, 2000, in Sedgwick County, Kansas.

*"Under this instruction, a statement that defendant, Gerry A. Burden, has already committed violence is the same as a threat to commit violence.*

"As used in these instructions, the term 'terrorize' means to reduce to terror by violence or threats, and terror means an extreme fear or fear that agitates body and mind." (Emphasis added.)

Defense counsel objected to the use of the emphasized sentence, arguing the facts of the case did not support the instruction and it would cause juror confusion, because of the evidence presented on previous domestic violence between the victim and Burden. The district judge overruled the objection, stating:

"Well, I've heard in this courtroom the 1998 case and her statement to the detective on tape that this beating occurred on a regular basis. That while he drank throughout the week, on the weekends — almost every weekend was violent; an argument ensued or there was some slapping. I think the facts do support whether or not the victim was terrorized, that the past conduct or the fact that he committed violence in the past would go to that as opposed to, oh, gee, he — yeah, he said he threatened to kill me; I really didn't take him seriously; he had been drinking and we were arguing; it was a heated argument, and those were just words he blurted out he really didn't mean, and I really didn't take him seriously.

"I mean, that's what that additional statement is intended to address, if there's a history of conduct of the parties. There's been violence committed in the past, and she's on the receiving end of this battering, and she can remember the past conduct. Then he couples it with the threat, I'm going to kill you and I don't care if I go to jail. That gives her a basis to believe that he really means it."

During closing argument, the prosecutor, Ms. Ladner, made the following remarks concerning Burden's claim that his finger was too short to have caused the red mark seen on C.G.'s cervix:

"Defense No. 5, his fingers are too dainty and petite, at three inches, to have injured her cervix like that. Ladies and gentlemen, particularly ladies, anybody who has had a pelvic examination, do you think that every time that has to be done they have to say, Paging Dr. Longfingers; we got to check somebody's cervix to see how far they're dilated. His fingers are too petite to cause these injuries. Remember what her body language was like on the video. He kept doing the finger thing; he kept doing the finger thing. Maybe self-consciously or not, she kept moving her arm up in a jabbing motion with her fingers.

. . . .

"(MS. LADNER:) The inference is that Ms. Flowers and Linda Hollis injured her cervix when they inserted the speculum. That redness is not from infection. It is from blunt force trauma. The location of that —

"MR. WEISER [defense counsel]: Your Honor, I object. Assuming facts not in evidence.

"THE COURT: The jury is instructed if any of these statements are not supported by the evidence, they are not to consider it. That's for them to determine.

"MS. LADNER: That redness on the cervix is from blunt force trauma. The same redness is in the labia minora and the fossa navicularis. The locations of the redness in each area are consistent, all at 5:00, and consistent with what they described. If a person can't reach a cervix with a finger three inches long, then every healthcare provider, every labor and delivery room in this nation are going to have fingers that are four to six inches long. You can't be an obstetrician if your fingers are too short. Figure it out. Use your common knowledge and experience in assessing this case."

The prosecutor made the following statements about whether Burden was interested in the truth, the burden of proof necessary in this case, and domestic violence victims:

"And finally, you know, the defense told you in opening statement that they were really only interested in you finding the truth and the truth coming out about this case. When Detective Reynolds went to the house on the 18th and wanted to ask [Gerry] Burden what happened here, he refused to answer any questions. He turned his back and walked away. The defendant himself, is he interested in the truth? I didn't touch her; she was like that when I got here. Do you think he was interested in the truth? The defense is more interested in snowing you into an acquittal so that he cannot be held responsible for the violent acts that he did.

"The burden of proof, you must presume he is not guilty until you find from the evidence that he is guilty. At what point in this trial could you have made that finding? Beyond a reasonable doubt, not beyond any and all doubt but beyond a

reasonable doubt. I suggest it was after the last ten minutes or so of the video statement, coupled with the feces report, coupled with the testimony of Twila Flowers, regarding the burden of proof in her testimony. Well, she's lying; she lied then; she's not lying now. What of her do you accept or reject? Use your common sense.

"Why is it the policy of the police department to record domestic violence victims? Because you have seen for yourselves firsthand why it is difficult for victims of domestic violence regarding a perpetrator who is somebody that they have an ongoing relationship with to later come forward and testify against them. Do you fault the police department or the district attorney's office for proceeding in a case like this where a victim recants? Do you think that just because a victim recants that the case should automatically be dropped, dismissed and forgotten? Using common sense, the community proceeds to prosecute these kinds of violence even when a victim recants when — like in a case like this when there is so much other corroborating physical evidence.

. . . .

"Another example to the defense. Are you in an intimate relationship with [C.G.]? Yes, we are. He answered in present tense. Why do you think it is that she has testified as she has in court today? It's because of where she has come from and what relationship she is in with this family. She is a classic example of a domestic violence victim who recants and returns — or tries to protect her abuser for whatever reason. She is still needing protection from herself.

. . . .

". . . You have had a glimpse into the dynamics of what a woman as a victim of domestic violence, one with a past history of violence — that her life has gone through. The focus is on [C.G.] and how untrustworthy she is. Put the focus back on the defendant . . . ."

The prosecutor concluded the first portion of the closing argument by saying:

"You know, the most overwhelming thing that the defense cannot overcome in this case is the physical evidence that corroborates her initial statements. He's not responsible for these crimes; a mouse is responsible and not a man for this case, or a dog, I suppose. You know, his first statement after all is, I didn't touch her; she was like that when I got there; it's the mouse; it's the dog; it's our regular sex acts; whatever it was, it was not me. Take the focus away from [C.G.] in this case and put the focus back on the defendant for his actions and what he did here."

### Removals of Potential Jurors for Cause

Burden argues the district court abused its discretion by failing to remove potential jurors Ms. W., Mr. P., and Ms. C. for cause after they expressed reservations about their ability to be fair and

impartial. He contends he was denied ·due process by having to use his peremptory strikes to remove them from the jury.

Because the district court is in a better position to view the demeanor of prospective jurors during voir dire, a district court's ruling on a challenge for cause will not be disturbed on appeal unless it is clearly erroneous or amounts to an abuse of discretion. *State v. Kleypas*, 272 Kan. 894, 991, 40 P.3d 139 (2001).

K.S.A. 22-3410 provides in relevant part:

"(1) Each party may challenge any prospective juror for cause. Challenges for cause shall be tried by the court.

"(2) A juror may be challenged for cause on any of the following grounds:

. . . .

(i) His state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he can act impartially and without prejudice to the substantial rights of any party.

"(3) All challenges for cause must be made before the jury is sworn to try the case."

Taking Mr. P. and Ms. C. first, although the parties and the district judge engaged in further questioning of them, the district judge specifically noted that neither party had challenged either for cause. Because Burden did not challenge these potential jurors for cause at trial, this claim is not properly before this court. See *State v. Smith*, 268 Kan. 222, 243, 993 P.2d 1213 (1999) (issue not raised below will not be considered for first time on appeal). He has cited no authority to support a holding that a district judge must take the initiative to strike venire members for cause in the absence of a motion by one of the parties.

As to Ms. W., who was challenged for cause below, she ultimately said she could make her decisions in this case based on the evidence and not on her past experiences. The district court did not abuse its discretion in refusing to remove her from the panel for cause.

Because Burden was not forced to use peremptory challenges to remove venire members who should have been struck for cause, we do not reach his argument that his statutory right to a number of peremptories equal to that given the State was violated. Nor do

we address the remedy for any such violation. Those questions are left to another panel deciding another case on another day.

*Sufficiency of Evidence in Support of Aggravated Kidnapping*

Burden next argues insufficient evidence was presented to support the taking or confinement element of aggravated kidnapping under K.S.A. 21-3421 and K.S.A. 21-3420(c).

K.S.A. 21-3421 provides in relevant part: "Aggravated kidnapping is kidnapping, as defined in K.S.A. 21-3420 and amendments thereto, when bodily harm is inflicted upon the person kidnapped." K.S.A. 21-3420 provides in relevant part:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:

. . . .

"(b) to facilitate flight or the commission of any crime;
"(c) to inflict bodily injury or to terrorize the victim or another."

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether all of the evidence, viewed in the light most favorable to the prosecution, could have convinced a rational factfinder to find the defendant guilty beyond a reasonable doubt. *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999).

Burden argues that, under *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976), the taking in this case from the back door into the bedroom was slight or inconsequential; thus it was inadequate to support the taking or confinement element of 21-3420. In *Buggs*, the Supreme Court held:

"[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

"(a) Must not be slight, inconsequential and merely incidental to the other crime;
"(b) Must not be of the kind inherent in the nature of the other crime; and
"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

In Burden's view, even if he dragged C.G. from the back door to the bedroom to continue hitting her, this movement was only incidental to the beating and had no significance independent of it.

The State argues that the *Buggs* analysis was developed in the context of a 21-3420(b) kidnapping, *i.e.*, one to facilitate flight or commission of another crime, rather than a 21-3421(c) kidnapping, one to inflict bodily injury or terrorize the victim or another. It also cites to *State v. Richmond*, 250 Kan. 375, 377, 827 P.2d 743 (1992) (describing *Buggs* as "[t]he leading case on what is required to be proven to establish the facilitation of the commission of any crime provision of K.S.A. 21-3420[b]"), suggesting *Richmond* emphasizes that the *Buggs* analysis is applicable *only* in 21-3420(b) cases. See also *State v. Fisher*, 257 Kan. 65, 75, 891 P.2d 1065 (1995) ("*Buggs* is the leading Kansas case which discusses in depth the crime of kidnapping and the elements necessary to establish the offense where a taking or confinement occurs to facilitate the commission of another crime.").

Although the State is correct that several of the other later cases cited by Burden also arose out of 21-3420(b) kidnappings rather than 21-3420(c) kidnappings like this one, see, *e.g.*, *Fisher*, 256 Kan. at 74-78; *State v. Hays*, 256 Kan. 48, 61-63, 883 P.2d 1093 (1994), it fails to recognize that *Buggs* addressed an element of the kidnapping statute common to *both* facilitation and bodily injury cases. In all simple and aggravated kidnappings—whether effected to facilitate another crime or to inflict bodily injury or for one of the other reasons listed in the statute—the State must prove a taking or confinement. The interchangeable specific intent subsections of the statute on which the State wants us to focus define proof alternatives for a *different element* of the offense.

In the end, the State's argument misses the point of Burden's attack on the sufficiency of the evidence. *Buggs* did not merely set forth the minimum evidentiary threshold for demonstrating the presence of only one or the other type of specific intent required for a kidnapping. It also set forth the minimum evidentiary threshold for demonstrating the presence of the common, and constant, element of taking or confinement. See *State v. Wiggett*, 273 Kan. 438, 445, 44 P.3d 381 (2002) (*Buggs* court sought to define, distinguish "taking" requirement of kidnapping from incidental movement that often occurs during robbery or rape). It is this element on which Burden asserts the evidence against him comes up short.

*State v. Mahlandt*, 231 Kan. 665, 647 P.2d 1307 (1982), is demonstrative. In that 21-3420(c) case, there was evidence the clerk in a store that defendant had just robbed was forced from the store and into defendant's car. The clerk was able to escape before the defendant drove out of the store's parking lot. The defendant argued on appeal that this evidence supported only an attempted kidnapping rather than the completed crime. The Supreme Court rejected this argument, specifically discussing under the *Buggs* standard whether the evidence proved a completed taking from the store and a completed confinement in defendant's car. 231 Kan. at 670-71.

In contrast, other subsection (c) bodily injury cases that have not discussed *Buggs* generally address a kidnapping element other than taking or confinement. See *State v. Higgenbotham*, 264 Kan. 593, 607, 957 P.2d 416 (1998) (although court mentions challenge to sufficiency of evidence on taking and confinement, it discusses only challenge to sufficiency of evidence on force, threat, or deception); *State v. Dubish*, 234 Kan. 708, 716-17, 675 P.2d 877 (1984) (challenge to sufficiency of evidence on specific intent to inflict bodily injury or terrorize); *State v. Racey*, 225 Kan. 404, 408, 590 P.2d 1064 (1979) (challenge to sufficiency of evidence on force, threat, or deception). These cases simply do not prevent us from doing exactly what we think the Supreme Court intended for us to do when the sufficiency of the evidence of a taking or confinement is challenged: We evaluate the facts of the case under the *Buggs* standard.

When we do so here, we see that Burden beat, sodomized, and raped C.G. in the bathroom, that she then ran from the bathroom to the vicinity of the back door, and that Burden caught up with her and dragged her back to the bedroom where he continued to batter her and choked her and threatened to kill her. Even viewing this evidence in the light most favorable to the State, we agree with Burden that *Buggs* dictates a holding that the movement of C.G. from the back door to the bedroom was part and parcel of the beating rather than a crime apart from it. The evidence of a taking and confinement was not independent of the other crimes Burden perpetrated. His movement of C.G. only enabled him to continue

what he had started and was incidental to it. Burden's conviction for aggravated kidnapping must be reversed.

### Instruction on Criminal Threat

Burden next challenges the instruction given on criminal threat, contending in his statement of the issues that it was misleading and denied him a unanimous verdict. He has failed to brief the unanimity argument, however, and that argument is deemed abandoned. See *State v. Valdez*, 266 Kan. 774, 784, 977 P.2d 242 (1999).

We are governed by the following standard of review:

"When reviewing challenges to jury instructions, an appellate court is required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law, as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do [not] constitute reversible error even if they are in some way erroneous." *State v. Scott*, 271 Kan. 103, Syl. ¶ 10, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001).

The instruction at issue came from PIK Crim. 3d 56.23. Burden is correct that the accompanying Notes on Use provide that the questioned language—"[u]nder this instruction, a statement that defendant has already committed violence is the same as a threat to commit violence"—should be used only when "the defendant communicated a statement of past conduct rather than a threat of future conduct." Because Burden communicated only a threat of future conduct, the State concedes that the challenged portion of the criminal threat instruction was given in error. We agree.

We must therefore consider whether the error demands reversal. We have found no cases that have dealt specifically with the erroneous inclusion of this portion of the criminal threat instruction. Burden argues the jury could have misinterpreted the erroneous portion of the instruction and found that the *prosecutor's* statement about Burden's previous domestic violence satisfied the requirement of a "statement," because the instruction did not specify that the "statement" must be made by the defendant.

This argument lacks merit. The remainder of the instruction makes clear that a criminal threat conviction required *Burden* to have made the threatening statement. Although the prosecutor's

reference to the elements of the crime in closing argument may have compounded the instructional error in part, she also reminded the jury to focus on the words Burden spoke to C.G. in the bedroom. This was plenty to keep jurors' eyes on the correct ball. Viewing the instructions as a whole and in the context of the evidence and argument, the jury was not misled to a criminal threat conviction. Omission of the questioned language would not have changed the ultimate outcome.

### Prosecutorial Misconduct

Burden's last issue is prosecutorial misconduct. He contends the statements of the prosecutor quoted above in the factual and procedural background were irrelevant and inflammatory, repeatedly misstated the evidence, and attacked him personally and unfairly. At trial, his counsel objected to only one of the statements Burden now questions, but our Supreme Court has held that the contemporaneous objection rule does not bar our consideration of this issue when a defendant's right to a fair trial is implicated. *Kleypas*, 272 Kan. 894, Syl. ¶ 19. Furthermore,

"[a]n appellate court's analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process: First, the appellate court must determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, the appellate court must determine whether the remarks constituted plain error; that is, whether they were so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. In order to find that the remarks were not so gross or flagrant, the appellate court must be able to find that when viewed in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial."

"Factors relevant in determining whether a new trial should be granted for prosecutorial misconduct include: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the part of the prosecutor, and (3) whether the evidence against the accused is of such a direct and overwhelming nature that it can be said that the prejudicial remarks of the prosecutor were likely to have little weight in the minds of the jurors." 272 Kan. 894, Syl. ¶¶ 20 and 21.

Burden's first allegation of prosecutorial misconduct centers on the prosecutor's ridicule of his defenses, specifically her suggestion that if his defense regarding the length of fingers held sway, doctors would be required to have especially long fingers to do pelvic ex-

ams. "In closing argument, an attorney may indulge in impassioned bursts of oratory or may use picturesque language as long as he or she introduces no facts not disclosed by the evidence." *State v. Duke,* 256 Kan. 703, 719-20, 887 P.2d 110 (1994). While it is true that the prosecutor appeared to be sarcastic in some of her statements, a review of the transcript reveals that she was, in fact, commenting on the evidence presented at trial. Regarding the "fingers" comments, the nurse who performed C.G.'s exam testified that it is normal for a person to be able to touch the cervix with a finger. Moreover, the prosecutor was entitled to urge the members of the jury to use their common knowledge and experience to determine whether someone would need long fingers to reach a woman's cervix with his or her fingers. See *State v. Mitchell,* 269 Kan. 349, 360, 7 P.3d 1135 (2000).

Burden next argues the prosecutor shifted the burden of proof by concluding: "[T]he most overwhelming thing that the defense cannot overcome in this case is the physical evidence that corroborates her initial statements." This comment was inartful, but the jury was instructed on the proper placement of the burden of proof. "[W]here the jury has been properly instructed the prosecution has the burden of proof, a prosecutor may argue inferences based on the balance or lack of evidence, provided that the remarks do not indirectly draw an adverse inference regarding the defendant's failure to testify." *State v. McKinney,* 272 Kan. 331, 346, 33 P.3d 234 (2001); compare *State v. Lumley,* 266 Kan. 939, 964, 976 P.2d 486 (1999) (prosecutor's statements, taken in context, not reversible error). In this case, the prosecutor was not attempting to shift the burden of proof to the defendant. Rather, she was within the considerable latitude granted to prosecutors to comment on the weakness of defenses in comparison to the consistency between C.G.'s early accounts and the physical evidence.

Burden's third allegation of prosecutorial misconduct is more troubling. He notes that the prosecutor told the jury he was not "interested in the truth" and was more interested in "snowing" them so that he would not be held responsible for his actions. These statements were clearly improper under *State v. Pabst,* 268 Kan. 501, 506, 996 P.2d 321 (2000).

Burden's last challenge to the prosecutor's conduct focuses on her statement that victims of domestic violence often recant and her characterization of C.G. as a "classic example of a domestic violence victim who recants and returns" to her abuser. Evidence was presented at trial that Burden had been convicted of battering C.G. previously and that they were still living together at the time of the incident. The prosecutor's statements were thus based on facts in evidence and not outside the considerable latitude granted to prosecutors during argument.

We do not believe the prosecutor's isolated remarks in attacking Burden's credibility were so gross and flagrant that they denied Burden a fair trial. Despite C.G.'s recantation, the case against Burden was a strong one. The victim's original story, captured on videotape, was corroborated by the sweatshirt and her vaginal and other bodily injuries. Under these circumstances, these comments on Burden's credibility, though improper, do not demonstrate ill will and do not require reversal.

Burden's convictions for rape, aggravated criminal sodomy, and criminal threat are affirmed. His conviction for aggravated kidnapping is reversed.

Affirmed in part and reversed in part.