No. 79,372

STATE OF KANSAS, *Appellee,* v. DEANDRE HARRIS, *Appellant.*
(970 P.2d 519)

Opinion filed December 11, 1998.

*Craig H. Durham,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the briefs for appellant.

*Terra D. Morehead,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by Deandre Harris of his jury conviction of premeditated first-degree murder. Harris and Code Laster were charged and tried together for the murder of Paul Moore. Their appeals were filed separately. Harris claims the trial court erred in failing to instruct the jury on lesser included offenses and eyewitness identification; that it had to find the elements of aiding and abetting beyond a reasonable doubt; that the evidence was insufficient to support the conviction; and that he was deprived of due process.

On August 23, 1996, Paul Moore died of multiple gunshot wounds. He was shot at approximately 5 p.m. in an alley behind 2938 Hiawatha in Kansas City, Kansas. The State hypothesized that Laster believed Moore had stolen his car the night before and wanted to kill Moore or have him killed in revenge.

A forensic firearms examiner testified that nine shell casings recovered from the murder scene were all 9mm and all were fired from the same gun. Five fired bullets and a bullet fragment also were recovered. The fragment yielded no information. The five fired bullets were all 9mm and all were fired from the same gun. He could neither rule out nor confirm that the shell casings and the fired bullets were from the same gun.

Seven trial witnesses, including codefendants Laster and Harris, testified that they were in the vicinity and saw the shooting or heard gunshots. Harris and Laster both denied any involvement in or prior knowledge of the shooting, and each exonerated the other of involvement.

At approximately 9:20 a.m. on August 23, 1996, a police officer found a car stripped of its tires and wheels and with a damaged steering column and a broken rear window. It was a 2-door Chevrolet Monte Carlo. A bill of sale in the glove compartment bore the name Code Laster.

Laster testified that his car had broken down the night before and that he had paid to have it towed to his mother's house at 3018 Hiawatha. Once there, he saw Moore, who lived in the 3000 block of Hiawatha and whom Laster had known all his life. Moore was a mechanic; he worked at Pete's Auto at 18th and Quindaro. Moore

looked at the car, said that it needed a new starter, and told Laster to get a starter and meet him there at 8 o'clock in the morning.

Laster did not get up until approximately 10:30 the next morning, August 23. He and his cousin, Kevin Bauswell, went to an auto parts store, bought a starter, stopped for some lunch, and then went to Moore's mother's house to see if Moore was there. No one was home. They went by Pete's Auto and asked about Moore, but he was not there. Before noon, they went to Laster's mother's house where Laster learned that his car had been stolen.

Laster went to the tow lot, where his car had been taken and where he saw that the Dayton wheels were missing. He then went to see his insurance agent. He got back to his house between noon and 1 p.m. Harris was there. Laster and Harris were cousins and friends, and they spent a lot of time together. When they later left the house, they were together in Harris' car, a white over light blue 4-door General Motors car. Laster was driving, and they were going to Laster's mother's house.

An acquaintance they knew as Terrock flagged them down and asked for a ride to 18th Street. Terrock got in behind Harris, and they drove to 18th and Quindaro. Near there, they pulled into an alley because the car was overheating. When they got out of the car, Terrock took off his shirt, revealing tattoos on his arm and chest, and had a gun at his waist. Laster and Harris testified that they were not aware until then that Terrock had a gun. Terrock put his shirt on his head and went off on foot by himself.

Laster testified that he and Harris started off on foot toward Laster's mother's house. They talked to Harold Jerome Harrison. Laster asked if Harrison had seen Moore because, although he did not think Moore had stolen his car, Laster wanted to ask Moore if he had seen anyone else around it. Harris went back to his car to roll up the windows, and Laster walked on down the alley. He saw Moore behind Chris Williams' house, and Moore greeted him. As Laster was about to ask Moore about his car, Terrock ran up, pulled his gun, and started shooting. Laster turned, saw Harris at the end of the alley, and ran.

Harris testified that he returned to his car, rolled up the windows, locked the car, and then followed Laster. As he walked to

the entrance of the alley behind Chris' house, he could see Chris, Moore, Laster, and some other people. He saw Terrock run up the alley from Hiawatha and begin shooting. Harris did not have a gun, and he saw no one but Terrock with a gun. He heard two to three shots and saw Laster run, and he ran too.

Harrison, who worked as a janitor at Pete's Auto, knew Laster and knew Harris, not by name but knew his face. Harrison testified that on the afternoon of August 23 he was intoxicated from drinking beer and he also had been "smoking weed." He first saw Laster on August 23 between 2 and 4 p.m. Laster arrived at Pete's Auto driving a brown over cream car with Dayton wheels. His cousin Byron and another man, whom Harrison did not know, were with Laster. Laster asked Harrison if he had seen Paul Moore, and Harrison said Moore had gone up the alley. Five to 10 minutes later, Harrison saw Laster again. The second time, Laster was in a different car, a gray 4-door. Laster was driving, and there were three other people in the car, including Harris, who was in the front passenger seat. Harrison had never seen either of the back seat passengers before. All four got out of the car, and Laster again asked Harrison if he had seen Moore. Harrison testified that he and Moore had just walked through the alley together. He told Laster that Moore had just gone to his house.

Harrison, in a statement given to police, had said that he did not see any weapons on Laster or the three passengers. At trial, he first testified that Harris had a tattoo on his right forearm and had a gun. Then he testified that Harris had neither a tattoo nor a gun; in fact, he did not even remember Harris being there. He testified that a tattooed man with a "[do] rag" had a gun. Later, Harrison heard gunshots.

Willis Williams lives at 2938 Hiawatha with his mother and his brother, Chris Williams. Moore was shot in the alley behind their house. On August 23, Willis Williams was working on a driveway for someone else who lived on his block. He heard gunshots, turned around, and saw a man standing over Moore, shooting him. The gunman was medium brown-skinned with a tattoo on the right side of his body and a shirt over the back of his head. Approximately 5

minutes earlier, he had seen two people, neither of whom was the gunman, walk past him in the alley.

Chris Williams, in the late afternoon of August 23, was installing a radio in a blue Honda for a woman named Audrey. The car was parked beside the driveway on the side of his house. Paul Moore came by and said somebody was looking for him about a car. Sometime later, two men, both looking angry, approached from the alley. One of the men was Laster. Williams did not recognize the other man, who was brown-skinned, stocky, with long Afro hair, no shirt, and a tattoo on his right arm. Harris was not there. As the two men approached, Moore asked, "What's up?" and the tattooed man began shooting at Moore with a large handgun. Williams immediately ran. Of the six to eight shots he heard, Williams saw only who fired the first shot. He did not see whether Laster had a gun.

D.P., a 13-year-old boy whose house is near the Williams' house, testified that on the morning of August 23 he heard from his bedroom somebody putting on their brakes. Looking out, D.P. saw Laster's car. He did not see who was in the car, nor did he recognize the person's voice. He testified that he knew Laster and Harris. In the afternoon, as he was walking home through the alley with his friend, M.S., he saw two men he could not identify walking in the alley. He also noticed that there was a blue car parked behind the Williams' house with the hood up, with a woman and Moore near it. D.P. and M.S. went around to the front of D.P.'s house, and, when they were on the front porch, D.P. heard approximately six gunshots.

The State introduced evidence that D.P. had given a statement to police in which he said that prior to the murder, Laster and Harris had been driving around the neighborhood looking for Moore. D.P. told police that Laster said he was going to get Moore for stealing his Monte Carlo. D.P. also told police that he saw Laster and Harris in the alley before the shooting.

M.S., an 11-year-old, lived in the 3000 block of Hiawatha at the time of the murder. He knew Moore, he knew Laster, and he knew Harris as Laster's friend. Sometime earlier that day, on August 23, M.S. saw Laster driving his car, which M.S. described as peach colored and which had Dayton wheels. Laster approached M.S.

and said he was looking for Moore because Moore had stolen his car and he was going to kill him. Laster had a gun, which M.S. called a "nine," on the side of his hip. M.S. testified that he did not think there was anyone with Laster at that time. Later in the day, M.S. and D.P. were walking to D.P.'s house. M.S. first testified that he saw Laster and Harris approach through the alley and shoot Moore. He said he thought it was Laster who shot Moore. Then he said that he could not remember who had the gun. Later, he testified that at the time of the shooting, he and D.P. were running from the alley toward D.P.'s front porch so that he did not see any shots being fired. He heard approximately six gunshots. From the front porch, he saw Laster and Harris running, and he saw two other men walking in the alley. A Toyota drove up to the two unidentified men, they got in, and they drove away.

The trial court gave the following instruction without specifying to which defendant it might apply:

"A person who, either before or during its commission, intentionally aids, abets, advises or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

The jury convicted Harris of premeditated first-degree murder. An aiding and abetting theory of guilt was not represented on the verdict form—options on the form were "guilty of First Degree Murder as charged in the Information" or not guilty.

Harris first argues that the trial court should have instructed the jury on lesser included offenses. Harris asserts that there was evidence that he "did not share in the premeditated designs of Code Laster or Terrock." He contends that the jury should have been instructed on the lesser included offenses of intentional second-degree murder, unintentional second-degree murder, and involuntary manslaughter because there was evidence that he intended to aid and abet a lesser crime than premeditated first-degree murder. The State's position is that there was no evidence upon which Harris might reasonably have been convicted of any of these lesser offenses. We agree.

With regard to the trial court's duty to instruct on lesser offenses, this court recently stated:

"A criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense." *State v. Moncla*, 262 Kan. 58, Syl. ¶ 7, 936 P.2d 727 (1997).

According to Harris, he had no "knowledge of a criminal venture." Even though the defendant denies any knowledge or involvement of any kind in the shooting, he maintains that there is evidence that would justify a jury verdict of each of the lesser offenses. Harris' argument is premised on the notion that his criminal liability, as an aider/abettor, is based on his own intention with regard to the victim and is independent of Laster's intention. However, even assuming for the purpose of discussion that Harris' intention pertains, the evidence excludes any theory of guilt on the lesser offenses.

The evidence Harris contends would support a jury verdict of involuntary manslaughter combines the State's evidence that he was aware that Laster was angry at and was looking for Moore with his own testimony that he loaned his car to Laster and accompanied him but did not become aware that Terrock had a gun until they stopped the car. According to Harris, "his state of mind in such a scenario would be considered reckless." He cites the definition of "reckless conduct" in K.S.A. 21-3201(c), which provides: "Reckless conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger." Harris seems to be saying that at the time he rendered aid to Laster by loaning his car and accompanying him in searching for Moore, Harris was not aware that a deadly weapon might be used against Moore. There was evidence that Laster was looking for Moore in order to kill him, and there was other evidence that Laster was looking for Moore in order to ask him if he had seen anyone else around the car. If Harris aided Laster, knowing that Laster intended to kill Moore, then Harris aided in a premeditated murder. If Harris

aided Laster, believing that Laster intended to ask Moore who might have been around the Monte Carlo, then Harris did not know that there was any threat of danger to Moore. Thus, the trial evidence would exclude his theory of involuntary manslaughter.

With regard to unintentional second-degree murder, Harris paints the same scene and asserts that it could be interpreted as showing his extreme indifference to the value of human life. See K.S.A. 21-3402(b). For the same reason stated in the preceding paragraph, the trial evidence would exclude his theory of unintentional second-degree murder.

With regard to intentional second-degree murder, Harris posits the jury's belief that he "shared in a desire to bring about Moore's death, and that he aided the others" in killing Moore and "that he did not share in the premeditation of that death." Harris contradicts himself in positing that he wanted Moore to die and helped kill him but had not thought of Moore's death beforehand. If Harris wanted Moore to die and aided others to kill him, Harris premeditated Moore's murder. Thus, his theory of intentional second-degree murder also is excluded.

Trial counsel did not request a cautionary instruction about eyewitness identification. This court's standard of review is prescribed by statute. Neither K.S.A. 60-251(b) nor K.S.A. 22-3414(3) permits a party that has failed to request an instruction or to object to the lack of one to assign as error the failure to give an instruction, unless the failure to instruct is clearly erroneous. Giving an instruction or failing to give an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred, there is a real possibility the jury would have returned a different verdict. See *State v. Lolar*, 259 Kan. 682, 687-88, 914 P.2d 950 (1996); *State v. Richmond*, 258 Kan. 449, 454, 904 P.2d 974 (1995).

Harris identifies two aspects of the evidence that he contends made a cautionary instruction necessary: (1) M.S.'s trial testimony that he saw Laster and Harris walking in the alley immediately before Moore was killed, and (2) D.P.'s statement to police that "Harris was riding around the neighborhood with Laster before the shooting, and that he was in the alley, armed with a gun, im-

mediately before the shooting." It is Harris' contention that the boys' evidence convicted him. Thus, his argument must be that there is a real possibility that the jury would not have believed their evidence and would not have convicted him if it had been instructed to exercise caution in considering eyewitness identification. See PIK Crim. 3d 52.20 (1995 Supp.).

M.S. actually testified that he saw Laster and Harris shoot Moore. That testimony has not been mentioned in connection with this issue. What Harris' appellate counsel has focused on is M.S.'s testimony that he saw Harris walking up the alley with Laster immediately before Moore was killed. It may be that he has not focused on the shooting because M.S. subsequently changed his story to say that he did not see it. What this strategy serves to emphasize is that the internal contradictions in M.S.'s testimony forced the jury to weigh the reliability of his eyewitness identification testimony irrespective of the instruction. His testimony could not simply be accepted or rejected. Instead, it was necessary for the jurors to deliberate about which, if any, version of his story to believe. The eyewitness identification instruction only would have cautioned them to do what they did out of necessity. In this respect, it cannot be said that there is a real possibility that the trial court's giving the instruction would have resulted in Harris' acquittal.

The same reasoning applies with regard to D.P. With him, too, there was not one version of events that included eyewitness identification. Instead, it was shown that D.P. told widely differing stories at various times. At trial, the State introduced the statement he gave to police to contrast with his trial testimony. Thus, the jurors necessarily gave serious consideration to the reliability of his testimony.

In addition, both boys were acquainted with Harris, and the shooting occurred in broad daylight. The boys' view was not obstructed or limited in any way. There is no evidence to cause the trial court to question the reliability of the eyewitness identification by the two boys. Absent such a question, PIK Crim. 3d 52.20 should not be given.

Harris next argues that the State deprived him of due process by stating in closing argument that the name "Terrock" was heard

for the "first time this week." In closing argument, the prosecutor stated:

"Instruction number twelve is probably the most important instruction in this entire pack, and what this instruction says is, 'If somebody aids and abets, helps and assists before or during the commission of a crime, they are just as responsible for that crime having been committed as if they committed it themselves.' And I don't dispute that there was this third guy there, and for the first time this week we hear his name Terrock."

Laster's counsel objected on the ground that "the prosecutor has just commented on my client about giving a statement prior to this case." After a bench conference, the objection was overruled. The prosecutor's closing argument continued with assertions about Laster and Harris delivering Terrock to the neighborhood in order to have him kill Moore and a few words about their being just as responsible as if they had pulled the trigger.

Although his counsel did not object during trial, on appeal Harris contends that the prosecutor improperly used his post-arrest silence to impeach his defense. He contends that the contemporaneous objection requirement was satisfied by Laster's counsel's objecting so as to give the trial court an opportunity to consider the issue. He cites no authority for his proposition. Each defendant was represented by counsel, and the record indicates that counsel did jointly and separately make objections at trial. We do not find any valid reason to allow a codefendant's timely objection to relieve Harris from the contemporaneous objection requirement. Harris also argues that the court should consider the issue "in the interests of justice and to prevent the denial of a fundamental right. *State v. Puckett*, 230 Kan. 596, Syl. ¶ 1, 640 P.2d 1198 (1982)." We do not find that Harris was denied any fundamental right in this regard.

Harris contends that "there is nothing in the jury instructions telling the jury that it must find the elements of aiding and abetting beyond a reasonable doubt." His concern is that the jury could have convicted him of aiding and abetting the murder on proof that did not dispel reasonable doubt. There is no contention that an objection was raised during trial. Conceding that the instructions must be read together, Harris denies that the burden of proof

instruction adequately combines with the aiding and abetting instruction. The two instructions stated:

> "A person who, either before or during its commission, intentionally aids, abets, advises or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."
>
> "The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty until you are convinced from the evidence that he is guilty.
>
> "The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims made by the State, you must find the defendant not guilty; if you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty."

Harris argues that the presence of the term "claims" in the burden of proof instruction and the absence of it in the aiding and abetting instruction creates a situation in which "[a] reasonable jury would not know to match" the two. He concedes that the issue was decided to the contrary in *State v. Nash*, 261 Kan. 340, 932 P.2d 442 (1997), but asks the court to reconsider its reasoning. We find the reasoning in *Nash* to be sound.

The instructions involved in *Nash* were for felony murder, aggravated robbery, and aiding and abetting. The argument was made that the jury would know from the presence of the term "claims" in the burden of proof instruction and the felony-murder instruction to read those two in conjunction, but that the jury would not have the same directive for the aiding and abetting instruction. The court rejected the argument: "We do not think that a reasonable jury, which read all the instructions together, would conclude that the felony-murder charge must be proven beyond a reasonable doubt, but that the charge of aggravated robbery, through aiding and abetting, does not have to be proven beyond a reasonable doubt." 261 Kan. at 343. We find nothing which would distinguish *Nash* and the present case. We find that *Nash* controls, and, even though Harris wants the court to distinguish it, he has provided no persuasive reason for doing so.

Harris also contends that the evidence adduced against him was too thin to support his conviction. The standard of review is well known:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Knighten*, 260 Kan. 47, Syl. ¶ 1, 917 P.2d 1324 (1996).

"In addition, '[t]he appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of a charge are sustained.' *State v. Pratt*, 255 Kan. 767, 768, 876 P.2d 1390 (1994)." *State v. Claiborne*, 262 Kan. 416, 425, 940 P.2d 27 (1997).

The facts set out earlier in this opinion establish that Harris, Laster, and Terrock drove together to the neighborhood where Moore lived and worked. There was evidence that Laster had been looking for Moore and was out to get him for stealing his car. There was some evidence that Laster shot Moore; there was some evidence that Harris shot Moore. There was evidence that Terrock shot Moore. There was evidence that Harris was seen running from the scene of the shooting.

Thus, there is evidence in the record from which a rational factfinder could have concluded beyond a reasonable doubt that Harris was involved in Moore's murder either as an aider/abettor or as a principal.

The judgment of the district court is affirmed.