No. 101,700

STATE OF KANSAS, *Appellee*, v. HO K. DUONG, *Appellant*.

(257 P.3d 309)

Opinion filed August 12, 2011.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Ho K. Duong was charged with aggravated indecent liberties with a child, and his first trial ended with a hung jury. Duong was convicted by the jury at his second trial, and the district judge departed from Jessica's Law and sentenced him to 61 months in prison and lifetime postrelease supervision with lifetime electronic monitoring. On this direct appeal, Duong asserts four trial errors and one sentencing error: (1) The prosecutor's comments in closing argument denied him a fair trial; (2) the district judge erred by failing to give the jury an eyewitness identification instruction; (3) the district judge erred by giving the jury an erroneous *Allen*-type instruction; (4) cumulative errors denied him his right to a fair trial; and (5) the journal entry of judgment was in error because of its provision for lifetime electronic monitoring.

We affirm Duong's conviction and vacate the electronic monitoring portion of his sentence.

## FACTUAL AND PROCEDURAL HISTORY

S.S. took her two children, 6-year-old A.C. and his 10-year-old sister, to the Wichita public library. Upon their arrival, the three used the public restrooms on the third floor. A.C. went into the men's restroom alone.

A.C. would testify later to the following: There was no one else in the restroom when he entered it. A.C. walked up to a urinal and pulled his pants half-way down to urinate. While A.C. was urinating, a man entered the restroom and stood at the urinal next to A.C. A.C. testified that the man reached over and used both of his hands to "wiggle" A.C.'s penis. A.C. eventually pulled the man's hands away, pulled up his pants, and left the restroom. No one else had entered the restroom during the incident.

A.C.'s mother was waiting for him when he emerged from the restroom. She noticed that A.C. looked "kind of shaken," and he immediately told her that a man had touched him in the restroom. After further inquiry, A.C. said that the man had grabbed his "private."

Jessica Gagnon was working that day in the nearby children's reading room, and she heard A.C. tell his mother about the man in the restroom. S.S. asked Gagnon to call for security, and Gagnon

complied. After making the call, Gagnon stood with A.C. and S.S. near a staircase outside the restroom. While Gagnon was there, defendant Duong exited the men's restroom, and A.C. immediately said, "That's him." S.S. told Duong to stop. Duong complied.

Library Security officer Winthrop Stanley arrived at the scene, and Gagnon returned to her post in the children's reading room. She had not seen anyone other than Duong exit the men's restroom during the time she stood with A.C. and S.S.

A.C. told Stanley what had happened, and Stanley called for a police officer to come to the library. After collecting identification from S.S. and Duong, Stanley took them and A.C. downstairs to wait for the police. At that point, Stanley had not seen anyone else exit the men's restroom, but he did not check whether anyone else was still inside it.

Wichita Police Officer Nathan Toman was one of the officers dispatched to the library. Toman did check the inside of the men's restroom, but he did not do so until 20 to 40 minutes after Stanley arrived at the scene. Toman found no one else inside the restroom.

Wichita Police Sergeant Kelly Mar interviewed both A.C. and Duong shortly after the incident was reported. During his interview, Duong initially stated that nobody else was in the restroom when he first entered. Duong repeatedly said he did not even notice the little boy. More than three-quarters of the way into Duong's interview with Mar, he changed his account, claiming that "many people" were in the restroom. Specifically, he said that there were two or three other men in the restroom, but he was unable to give a description of any of them. Duong also claimed that the men were still in the restroom when he left it.

The centerpiece of Duong's defense at trial was misidentification. The jury heard that Mar had asked A.C., "If you saw this man would [you] recognize him?" and A.C. had replied, "Probably." A.C. told Mar that the man was not wearing anything on his head. At trial, he did not remember if the man had a hat. A.C.'s description of the color of the man's shirt also varied slightly, from "red" to "light red" to "reddish-pinkish." Gagnon testified at trial that Duong was wearing a "funny" newsboy cap and a bright pink or fuchsia shirt.

Duong did not seek and the district judge did not give the jury a cautionary eyewitness instruction, as set out in PIK Crim. 3d 52.20. The district judge did give an *Allen*-type instruction, as set out in PIK Crim. 3d 68.12.

During closing argument, the prosecutor made the following statements without a defense objection:

"The facts surrounding the disclosure of this abuse lend to the credibility of State's theory of this case. [A.C.] told right away, he told immediately, the immediacy of his disclosure only adds to [A.C.'s] credibility. He came right out of that bathroom and he said mom, that guy in there tried to touch me. It's so credible because of that.

. . . .

"So look at yourselves, you are a combination of men and women of different ages and different occupations and some of you have kids of your own or siblings that you're taking care of, how do you—how do you analyze the credibility of the stuff that people tell you every single day in your lives? . . . You use your common sense in how you evaluate [A.C.'s credibility] and I suggest that he is credible.

"Why is he credible? Because of consistency, corroboration, and this child has no motive, there is such a lack of motive for this kid to falsify or distort. This is a stranger case. This isn't a sexual abuse allegation arising out of a child custody scenario, where two people are getting divorced or anything like that. There's no ill will here on the part of this kid or even on the part of [A.C.'s] family to make this thing up against this guy. He's an absolute stranger to their family, there's no motive on [A.C.'s] part to make this up.

"[A.C.] is consistent. He has never wavered on whether or not he was touched in the bathroom. Yeah, he says to his mom that guy tried to touch me in there, but think about it, how does a child communicate that first disclosure and then when you have a detailed interview of the child, he is absolutely consistent that he was actually touched on his penis . . . . He has never wavered on his identity of the person that did this to him.

. . . .

"What about, you know, you talk about [A.C.'s credibility], talk about—talk about the defendant's credibility. His undulating statement at the early part of the interview. Did you see a boy in that bathroom? No boy at all. He didn't see any boy. You know, it's deny, deny, deny, deny, until maybe three-quarters or maybe even little further into the interview and it's just like on TV, you know, the detective presses to get clarity, do you think that this detective was overreaching with this defendant in an unfair way?

"You know, he starts talking about Jesus Christ and so forth. And [Detective Kelly Mar] says well, that's great, but you know what Mr. defendant, I have had Christians in here who have also molested children, why do I have this child telling me this. You know, let's get to the point here separate and apart from what your

interpretation is, what happened in the bathroom? Why is this child telling me that he was touched? So he—falls apart. When confronted with the stark difference, the child is firm that he was touched and the defendant's stark denial, then he begins to fall apart.

. . . .

"I didn't know, I didn't know what the problem was, I didn't know, I didn't know. Ladies and Gentlemen, he knew, he knew as soon as he came out of the bathroom door, [A.C.] was right there and says that's him, that's the man that tried to touch me or that's the man that touched me. He knew as soon as he came out of the bathroom door what this case was about and what he was going to be confronted with.

. . . .

"Where are these many, many people who were in and out of the public bathroom that day? Or can you give us any information on the two to three other men who were in the bathroom that day? The officers were—and the family were [sic] right outside that bathroom door for five to [ten] minutes. Nobody else exited, folks. It is him. [A.C.'s] always described the touching in the same way.

. . . .

"You know, there were many people in the bathroom, in and out, in and out, it was two or three men. Tell us about these men, give a description. He is unable to give a description. You know, to play the whole interview for you is so helpful because you get a good grip on the quality of his ability to understand English, the quality of his ability to—to communicate in question and answer form. Yes, English is not his native language. Yes, he has an accent. But under the circumstances of what you've got here, don't you find, folks, that English is not the problem, but his credibility is?

. . . .

". . . Think about the circumstances, taking advantage of this little boy in a bathroom, where there's nobody else watching. The sexual intent comes from him. The sexual intent comes from what he did to the child, in the place that he did it, under the circumstances of where he did it. It was—you know, it is—the facts are compelling because this is such a breach of trust, because this was a public place.

"And there is no alternative theory of innocent touching, such as was the child so young, like in pull-ups or something, and he was just trying to help [A.C.] pee. No. Intentional means willful and purposeful and not accidental. Determine intent from all the facts of the case. And we've talked about this, you know, [A.C.], unfortunately, was vulnerable, he was exposed, his penis was already out when this began."

## PROSECUTORIAL MISCONDUCT

We analyze allegations of prosecutorial misconduct in two steps.

" 'First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal.' " *State v. Richmond*, 289 Kan. 419, 439, 212 P.3d 165 (2009) (quoting *State v. White*, 284 Kan. 333, Syl. ¶ 1, 161 P.3d 208 [2007]).

See also *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004).

The second step has required us to consider three additional factors:

" '(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial), have been met.' " *Richmond*, 289 Kan. at 440 (quoting *State v. Bryant*, 285 Kan. 970, Syl. ¶ 2, 179 P.3d 1122 [2008]).

See also *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004) (second step essentially directed to whether misconduct so prejudicial that it denied fair trial).

In addition, we have required a reviewing court to analyze the facts of each case to determine whether a prosecutor's statements denied the defendant a fair trial. *Tosh*, 278 Kan. at 85. A defendant is not required to make a contemporaneous objection to prosecutorial misconduct during closing argument to preserve the issue for appeal. *State v. Stone*, 291 Kan. 13, 17, 237 P.3d 1229 (2010).

Our recent decision in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), synthesized and clarified our caselaw on definition and application of harmless error standards, including the two we have relied upon in the second step of our analysis of prosecutorial misconduct claims. Because we conclude, as discussed below, that we need not reach the question of plain error in this case, we need not address the changes wrought by *Ward* or address any questions it leaves open.

Duong alleges that the prosecutor in this case committed misconduct during closing argument in three ways: By improperly bolstering the credibility of the victim and criticizing the credibility of the defendant; by improperly shifting the burden of proof to the defendant; and by inflaming the passions or prejudices of jurors by appealing to their fear of sex predators. We address each allegation in turn below.

*Comments on Credibility*

Duong alleges that, during closing arguments, the prosecutor improperly commented on both the victim's and defendant's credibility and accused the defendant of lying.

Generally, prosecutors cannot offer juries their personal opinions on the credibility of witnesses. *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010). We prohibit the prosecutor from expressing personal opinions on the credibility of a witness because such comments are "unsworn, unchecked testimony, not commentary on the evidence of the case." *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000). We also have held that accusing a defendant of lying is outside the wide rhetorical latitude afforded prosecutors in closing argument. *State v. Davis*, 275 Kan. 107, 121, 61 P.3d 701 (2003).

On the other hand, we permit lawyers to make statements during closing arguments that draw reasonable inferences from the evidence. *Stone*, 291 Kan. at 19. Specifically, prosecutors may explain " 'to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses.' " *Stone*, 291 Kan. at 19 (citing *State v. Scaife*, 286 Kan. 614, 623-24, 186 P.3d 775 [2008]). We recognize that it is proper for a prosecutor to assert "reasonable inferences based on the evidence and that, when a case turns on which of two conflicting stories is true, certain testimony is not believable." *Davis*, 275 Kan. at 121. Nevertheless, the jury must be left to draw the ultimate conclusion regarding the credibility of a witness. 275 Kan. at 121.

In *Davis*, the defendant challenged three statements by the prosecutor. First, the prosecutor argued that the victim's statements

were more credible than the defendant's because the victim made his statements while in an emotional state to a police officer, and the defendant made his statements after 10 months "with plenty of time for reflection and creation." 275 Kan. at 122. Second, the prosecutor argued that the evidence indicated that the victim "should be believed." 275 Kan. at 122. Finally, the prosecutor claimed that the defendant's allegation that the victim "set this whole thing up" was not believable. 275 Kan. at 123. This court held that the prosecutor was within the latitude afforded to the State during closing argument because the prosecutor "stated reasonable inferences based on the evidence," and the statements did not constitute vouching for the victim's credibility. 275 Kan. at 122-23.

Conversely, in *State v. Magallanez*, 290 Kan. 906, 235 P.3d 460 (2010), we held that there was prosecutorial misconduct when the statements made were not based on any reasonable inference from the evidence. In that case, the prosecutor had told the jury that "you trust children until you have a reason not to. We assume that. We assume we have taught them correctly." 290 Kan. at 912. This amounted to unsworn testimony about the truthfulness of children. 290 Kan. at 914.

We do not view a prosecutor's statement in isolation but in context. See *Stone*, 291 Kan. at 19-20. In *Stone*, the prosecutor had said, "A.L. told [the jury] what happened," and, "She is a credible witness." *Stone*, 291 Kan. at 19. We observed: "[T]hese comments were the brackets around an argument that detailed for the jury the factors that it could and should consider in determining the credibility of the witness." 291 Kan. at 19. With this broader view, we held that the prosecutor's statements were within the latitude afforded the State. We saw them as attempts to summarize the conclusion the prosecutor wanted the jury to reach from the evidence rather than expressions of the prosecutor's own judgment on the credibility of the witness. 291 Kan. at 20.

With these cases as our foundation, we hold here that the prosecutor's statements about A.C.'s and Duong's credibility were within proper bounds. The prosecutor drew reasonable inferences based on the evidence presented at trial and merely directed the

jury to specific testimony. For example, with regard to A.C., the prosecutor reminded the jury that A.C. disclosed his experience in the restroom immediately, that A.C. identified Duong immediately and consistently, and that Duong was a complete stranger. On Duong's credibility, the prosecutor pointed out that Duong first said that no one else was in the restroom and then changed his story. The prosecutor did not accuse Duong of lying but referenced evidence that rebutted Duong's statements to Mar. Each of the prosecutor's remarks fit within the context of an overarching evidence-based argument that A.C.'s story was more believable than Duong's.

*Burden Shifting*

Duong also alleges that the prosecutor improperly shifted the burden of proof to the defense by questioning Duong's failure to present evidence of misidentification.

Kansas courts deem it "improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof." *Stone*, 291 Kan. at 18 (citing *Tosh*, 278 Kan. at 89-92). But we grant prosecutors considerable latitude to address the weaknesses of the defense. *Stone*, 291 Kan. at 18 (citing *State v. Burden*, 30 Kan. App. 2d 690, 703, 46 P.3d 570 [2002], *rev'd on other grounds* 275 Kan. 934, 69 P.3d 1120 [2003]).

In *Tosh*, a rape case, the prosecutor asked rhetorically during closing: " '[I]s there any evidence that it didn't happen? Is there any evidence that the things she told you didn't happen?' " *Tosh*, 278 Kan. at 90. We held that posing these questions constituted an impermissible attempt to shift the burden of proof to the defendant. 278 Kan. at 92.

In *Stone*, we discussed the Court of Appeals' decision in *Burden*, 30 Kan. App. 2d 690. *Stone*, 291 Kan. at 18. There, the prosecutor had said, " '[T]he most overwhelming thing that the defense cannot overcome in this case is the physical evidence that corroborates [the victim's] initial statements.' " *Burden*, 30 Kan. App. 2d at 703. The Court of Appeals held that the prosecutor's argument, while inartful, did not attempt to shift the burden of proof to the de-

fendant. 30 Kan. App. 2d at 703. The court noted that the district judge had properly instructed the jury on the burden of proof and that the statements merely commented on the weaknesses of the defense. 30 Kan. App. 2d at 703.

Likewise, in this case, we read the statements at issue as mere comment on the weakness of Duong's defense. Duong wanted the jury to believe that there were several men in the bathroom with him and A.C. and that one of the other men was the perpetrator of the crime. The prosecutor's references to Duong's inability to give a description of the other men and to the fact that no one saw any other man leave the restroom were fair game. The prosecutor did not, as in *Tosh*, call upon the defense to disprove the occurrence of a crime; the prosecutor only pointed out that the evidence supporting the defense theory of the case was thin. We are further reassured that, as in *Stone*, Duong's jury was properly instructed on the State's burden to prove guilt beyond a reasonable doubt.

### Inflaming Passion or Prejudice

Duong's last challenge to the prosecutor's closing argument focuses on her discussion of the intent required for aggravated indecent liberties. In particular, Duong takes issue with the prosecutor's use of the words "exposed, "little boy," taken "advantage of," in a "public place," and a "breach of trust" in the following passage:

"Think about the circumstances, taking advantage of this little boy in a bathroom, where there's nobody else watching. The sexual intent comes from him. The sexual intent comes from what he did to the child, in the place that he did it, under the circumstances of where he did it. It was—you know, it is—the facts are compelling because this is such a breach of trust, because this was a public place.

"And there is no alternative theory of innocent touching, such as was the child so young, like in pull-ups or something, and he was just trying to help [A.C.] pee. No. Intentional means willful and purposeful and not accidental. Determine intent from all the facts of the case. And we've talked about this, you know, [A.C.], unfortunately, was vulnerable, he was exposed, his penis was already out when this began."

It is improper for a prosecutor to make statements during closing argument "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on

the evidence and the controlling law." *Tosh*, 278 Kan. at 90. A prosecutor has a duty to "ensure only competent evidence is submitted to the jury and avoid arguments that could prejudice the jurors' minds, preventing them from deciding the case on the evidence." *State v. Martinez*, 290 Kan. 992, 1015, 236 P.3d 481 (2010) (citing *State v. Ruff*, 252 Kan. 625, 636, 847 P.3d 1258 [1993]).

Duong cites nothing to support his position that the use of these particular words or phrases was intended to inflame the passions or prejudices of jurors. Of course, we generally view comments on issues outside the evidence presented as improper. See *Tosh*, 278 Kan. at 90 (prosecutor's comment that victim raped second time by credibility attack at trial improper); *State v. Henry*, 273 Kan. 608, 621, 44 P.3d 466 (2002) (prosecutor's comment encouraging jury to think about Mother's Day, feelings of victim's mother improper). And, in other cases involving sex crimes perpetrated against children, we have deemed it error for a prosecutor to appeal to parental instincts or urge the jury to protect the victim. *Martinez*, 290 Kan. at 1015 ("[let the victim] know 'she did the right thing' [by reporting the crime]" improper); *Tosh*, 278 Kan. at 92 ("When [the victim] was little, and even today, her father failed to protect her. He raped her. You can protect her. You can find him guilty" improper).

We reject Duong's claim that the selected language was intended to inflame the passions or prejudices of the jury and are exceedingly skeptical that it could have done so. Rather, the comments were closely tied to the admitted evidence in this case and were designed to address opportunity and motive. They illustrated, for example, how circumstantial evidence could be probative on the element of intent. Whatever embellishments the prosecutor added were tame. She stated only the obvious when she observed that fondling of a 6-year-old child in a public bathroom is a breach of trust that tears at our social fabric. Neither this remark nor the others Duong stresses were equivalent to improper, highly emotional pleading for parental protection of this victim or potential future victims.

*Conclusion*

Duong has not persuaded us that any of his criticisms of the prosecutor's statements in closing argument resulted in error. Lacking error, we need not move to the second step we employ in analysis of a claim of prosecutorial misconduct, *i.e.*, evaluation of whether any error is harmless.

## EYEWITNESS IDENTIFICATION INSTRUCTION

Duong's second claim on this appeal asserts error in the district judge's omission of a cautionary jury instruction on eyewitness identification pursuant to PIK Crim. 3d 52.20. This instruction reads:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he)(she) has been wrongfully identified. In weighing the reliability of eyewitness identification testimony, you should first determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on the observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused; and

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." PIK Crim. 3d 52.20.

At trial, Duong neither requested the instruction nor objected to its omission. He therefore cannot obtain reversal on this ground unless the judge's failure to give the instruction was clearly erroneous. K.S.A. 22-3414(3); *State v. Mann*, 274 Kan. 670, 677, 56 P.3d 212 (2002). We must be "firmly convinced that there is a real

possibility the jury would have rendered a different verdict if the trial error had not occurred." 274 Kan. at 677.

District courts should give the eyewitness cautionary instruction "in any criminal action in which eyewitness identification is a critical part of the prosecution's case and there is serious question about the *reliability* of the identification." 274 Kan. at 677; PIK Crim. 3d 52.20 (Notes on Use). Evidence calling reliability into question is key. See *State v. Harris*, 266 Kan. 270, 278, 970 P.2d 519 (1998). We consider five factors in determining whether there is a question about the reliability of eyewitness identification, as set forth in *State v. Saenz*, 271 Kan. 339, 354, 22 P.3d 151 (2001):

"(1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior descriptions of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation."

Duong argues that A.C.'s identification of him was the principal issue in this case and that, without the cautionary eyewitness instruction, the jury lacked the tools necessary to evaluate the identification. He cites *State v. Simpson*, 29 Kan. App. 2d 862, 32 P.3d 1226 (2001), to support his claim.

*Simpson* involved an eyewitness who saw the suspect for the first time for only 60 seconds in a dimly lit kitchen during a drug bust. In addition, the witness' view of the suspect's face was obstructed by a cell phone. The suspect had numerous gold teeth, which the eyewitness did not see. And the drug bust setting may have meant that the witness was nervous at the time she had contact with the suspect. In these circumstances, a panel of our Court of Appeals held that the cautionary eyewitness instruction was indispensable. 29 Kan. App. 2d at 881. Had the district judge given the instruction, there was a real possibility that the jury would have returned a different verdict. 29 Kan. App. 2d at 881.

We came to an opposite conclusion in *State v. Richmond*, 258 Kan. 449, 904 P.2d 974 (1995), in which we held that the cautionary eyewitness identification instruction was unwarranted because the reliability of the eyewitness identification was not seriously in question. In that case, the eyewitness testified that she saw the

defendant clearly and had six opportunities to observe the defendant. We also considered additional evidence against the defendant significant, concluding that there was no real possibility the jury would have rendered a different verdict if the court had given the eyewitness instruction. 258 Kan. at 457.

Duong insists that A.C.'s identification of him was so shaky that this case is far closer to *Simpson* than *Richmond*. We disagree. It is true that the State's evidence had a glaring weakness here—the failure of the security officer and the police to check the men's restroom for 20 to 40 minutes—but it was not A.C.'s immediate identification of Duong, unprompted by anything other than Duong's exit from the restroom. A.C. also consistently said that he and the man who touched him were alone in the restroom at the time. The man stood next to him at the urinals and then fondled his penis with both hands. Even though, as Duong argues, A.C. said on cross-examination that he only looked a "little bit" up at the man who touched him, it is apparent from A.C.'s description of the event that he had ample time to observe and had an unobstructed view. On these facts, the reliability of A.C.'s identification was not seriously in question; and the cautionary eyewitness instruction certainly was not indispensable.

We also are confident that, if the instruction had been given, it would not have made an acquittal of Duong likely, *i.e.*, "a real possibility" under our clearly erroneous standard of review. Indeed, the instruction both giveth and taketh away. A.C.'s instant report of the touching and his spontaneous and immediate identification of the perpetrator were among the factors on the instruction's list that would have cut persuasively in the State's favor. We see no similarly convincing factors on Duong's side of the case.

The district judge's omission of the cautionary eyewitness instruction was not clearly erroneous, and Duong is not entitled to reversal on that basis.

### *ALLEN*-TYPE INSTRUCTION

Duong next argues that the district judge erred by giving the following jury instruction:

"Like all cases, this is an important case. If you fail to reach a decision on some or all of the charges, that the charge or charges are left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge(s) to a different jury at a later time. *Another trial would be a burden to both sides.*

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over and differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary." (Emphasis added.)

This instruction, PIK Crim. 3d 68.12, is commonly referred to as an *Allen* or *Allen*-type instruction, after *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). Historically this court has allowed the instruction when given before jury deliberations began. See *State v. Anthony*, 282 Kan. 201, 216, 145 P.3d 1 (2006); *State v. Makthepharak*, 276 Kan. 563, 569, 78 P.3d 412 (2003).

In particular, however, Duong challenges the instruction's inclusion of the language "[a]nother trial would be a burden on both sides," which he regards as coercive, legally incorrect, and in conflict with another typical instruction, given here, which tells jurors not to concern themselves with anything beyond their determination of the defendant's guilt or innocence. See PIK Crim. 3d 51.10.

We have specifically addressed this language in several recent cases, filed since Duong's second trial, holding that the language was error because it was misleading and inaccurate. But we have not gone so far as to hold it clearly erroneous. See *State v. Brown*, 291 Kan. 646, 660, 244 P.3d 267 (2011); *State v. Colston*, 290 Kan. 952, 977-78, 235 P.3d 1234 (2010); *State v. Ellmaker*, 289 Kan. 1132, 1146, 221 P.3d 1105 (2009); *State v. Salts*, 288 Kan. 263, 266-67, 200 P.3d 464 (2009).

Our first question thus becomes whether the clearly erroneous standard applies to this case. As discussed, this court's review is governed by the standard when a party has failed to object to an

instruction's inclusion or omission in the district court. See K.S.A 22-3414(3); *Ellmaker*, 289 Kan. at 1145. The objection must be timely and specific. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, Syl. ¶ 2, 228 P.3d 1048 (2010). To reverse, we must be convinced that "there is a real possibility the jury would have rendered a different verdict if the error had not occurred." *Salts*, 288 Kan. at 265-66.

If, instead, a party objected to an instruction before the district court, an appellate court applies a less demanding standard of review, considering whether the instructions as a whole properly and fairly stated the law as applied to the facts of the case and whether they could have misled the jury. See *State v. Pruitt*, 42 Kan. App. 2d 166, 175, 211 P.3d 166 (2009); *State v. Page*, 41 Kan. App. 2d 584, 586, 203 P.3d 1277 (2009).

Here, during the jury instructions conference, Duong's attorney stated only: "Just for the record, [the defense] would object to the instruction, I believe it's number two, commonly known as the *Allen* instruction and wanted to get that on the record." The State contends that this vague statement was inadequate for Duong to escape the clearly erroneous standard of review on appeal.

We agree with the State. Although Duong's objection to the *Allen*-type instruction was timely, it was not specific. The district judge had no way of knowing that he needed to focus on the "burden" language eventually held to be misleading and erroneous in our *Salts* decision.

Application of the clearly erroneous standard of review dooms Duong's challenge to his conviction on this issue. We see no sign in the record on appeal that Duong's second jury was aware that his first jury had hung. Such awareness might have heightened any coercive effect of the "burden" language, at least marginally. We also perceive no other reason to depart from our conclusion in *Salts* that the "burden" language was erroneous but not clearly so. See *Salts*, 288 Kan. at 267. In our view, there is no real possibility that the outcome of Duong's second trial would have been different if the "burden" language had been omitted from the jury instructions. If we are not convinced on that point, no reversal is warranted.

## CUMULATIVE ERROR

Duong also invokes the cumulative error rule, which permits us to aggregate the prejudicial effect of more than one otherwise non-reversible error to grant a criminal defendant relief. See *State v. Cosby*, 285 Kan. 230, 250, 169 P.3d 1128 (2007) (citing *State v. Anthony*, 282 Kan. 201, 216-17, 145 P.3d 1 [2006]). The rule is not applicable when only one error has been identified, see *State v. Nguyen*, 285 Kan. 418, 436, 172 P.3d 1165 (2007), such as the inclusion of the "burden" language in the *Allen*-type instruction.

## LIFETIME ELECTRONIC MONITORING

The journal entry of judgment in Duong's case ordered lifetime electronic monitoring after his release from prison. Duong argues that there is no statutory authority for a sentencing judge to impose such monitoring, and the State concedes this issue.

We have unlimited review over issues of statutory interpretation. See *State v. Bello*, 289 Kan. 191, 195-96, 211 P.3d 139 (2009).

Under K.S.A. 22-3717(u) and our decision in *State v. Jolly*, 291 Kan. 842, 847-48, 249 P.3d 421 (2011), the parties are correct. Lifetime monitoring is associated with parole rather than the post-release supervision to which Duong will be subject when he is released from prison. The district judge lacked power to impose parole conditions.

## CONCLUSION

In light of all of the foregoing discussion, defendant Ho Duong's conviction for aggravated indecent liberties is affirmed. The lifetime electronic monitoring provision of his sentence is vacated.