NOT DESIGNATED FOR PUBLICATION

No. 122,276

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JESSE J. JACKSON JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; STEVEN R. EBBERTS, judge. Opinion filed October 15, 2021. Affirmed in part, reversed in part, sentence vacated, and case remanded with directions.

*Nicholas David*, of The David Law Office LLC, of Lawrence, for appellant.

*Michael J. Duenes*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., HILL and CLINE, JJ.

PER CURIAM: Raising several trial and sentencing errors, Jesse Jackson Jr. appeals his aggravated kidnapping, aggravated battery, and criminal possession of a weapon convictions. In line with a recent ruling of our Supreme Court, we overturn his criminal possession of a weapon conviction, as that statute has been ruled unconstitutional. After our review of the record and all authorities, we find that the claimed trial errors are not reversible. But we do find a criminal history score error that requires resentencing. Thus, we affirm his remaining convictions, vacate his sentence, and remand the matter to the

1

district court to resentence Jackson after it corrects his criminal history score in accordance with our holding.

*Bones are broken during a fight between a man and a woman who, at one time, lived together.*

Jackson and Melissa Lynch began living together in a Topeka house she rented in late 2016. About six months later, the couple argued and hit each other. And as a result of the fight, the landlord forbade Lynch from having Jackson over. Even so, Lynch had Jackson over two times in the next ten days.

One evening, after working a late nursing shift, Lynch did not get home until 1:30 a.m. The parties dispute much of what happened later that evening, but the following is undisputed: Later, Jackson and Lynch left Lynch's house in her car. Lynch drove at first, but Jackson eventually took over driving. After they had driven around for about three hours, making two stops along the way, Lynch jumped out of the car while it was still moving. Lynch was later treated for serious injuries at Stormont Vail Hospital. She attributed most of her injuries to Jackson attacking her during the drive and the rest to her jumping from the car.

Based on those reports, the State charged Jackson with seven felonies and a misdemeanor. Those crimes were aggravated kidnapping, aggravated battery, aggravated assault with a deadly weapon, burglary, criminal possession of a weapon, theft, criminal threat, and stalking (a misdemeanor).

At trial, Lynch and Jackson described two very different encounters.

According to Lynch, she worked the late nursing shift because she did not want Jackson coming over; she got home around 1:30 the next morning. Lynch had plans to

2

get dinner with her mom, dad, and daughter that evening. When she opened her garage door to get in her car and leave, Jackson popped out from in front of the car and said, "Get in the fucking car." She said no and was scared to see him because she had not invited him and had not expected to see him. Jackson was being controlling and did not say why he wanted her to get in the car. Lynch got in the driver's seat, although she did not want to. She thought it was the best option because she could drive herself to safety if it turned out to be a bad situation.

Lynch asked Jackson where he wanted to be dropped off because she had to go to dinner. Jackson said he wanted to go to a park, so Lynch went to a park that was open and well-trafficked. Jackson did not want to go to that park, though, so he gave her directions to drive to a secluded park.

After parking, Jackson became enraged after another man sent Lynch a text message on her phone. Jackson got out of the passenger seat and came around to the driver's door, which was open. He grabbed Lynch's leg, bent it, and broke it. He then pulled out a knife and threatened to slice her ankle if she did not get out of the driver's seat. Jackson then pulled Lynch out of the car by her ankles, and she hit her back and head on the ground. Jackson took the keys from her. At that point, Lynch tried to run. Jackson grabbed her and forced her into the back seat. When she tried to get out, he forced her to move up to the passenger seat.

Jackson started driving. Lynch tried to flag down a police car. Jackson pulled into a driveway and said that he would "split [her] from ear to ear" if she tried it again. Jackson continued to drive. While the car was stopped at a traffic light, Lynch grabbed Jackson's knife from his lap and threw it out the window. Jackson pulled out a second knife. Jackson eventually parked behind a building. He got out of the car, came around to the passenger side, and started beating Lynch. He struck her repeatedly, strangled her,

broke her nose and cheekbone, and tried to gouge her eye. Jackson got back in the driver's seat and stopped Lynch when she tried to get out of the car.

Jackson started driving again. Lynch became more scared as they entered a more remote area with fewer houses. She thought Jackson planned to kill her. Jackson refused Lynch's pleas to take her to a hospital. Lynch slowly unbuckled her seatbelt and, when the car had slowed down, she jumped out. Jackson grabbed her shirt and accelerated, dragging her along. He let go of her shirt, grabbed her hair, and then finally let go.

After she fell out of the car, Lynch heard a man and woman yelling for Jackson to stop and let her go. Lynch ran towards their vehicle, hopped in the passenger seat, and told them to drive off. The couple said their car was full because they had their kids, so Lynch got out, hid behind some trees on the side of the road in case Jackson returned, and collapsed. The couple called 911 and officers arrived on the scene. When Lynch was later treated at Stormont Vail Hospital, her nose was broken in two places, her cheekbone was broken, one of her eyes was swollen shut, her leg was broken, and she had pavement scrapes and a big gash on her head.

*Jackson's version of the facts differed from Lynch's.*

According to Jackson, Lynch was in the car voluntarily—he never intended to confine her or take her any place against her will. Nor did he ever threaten her with a knife. And he only hit her once in the face, causing her nose to bleed, and it was just a reflex after she stabbed him in the arm with a knife.

Jackson maintained that he did not break into her house early in the morning. Jackson had a key and he thought Lynch was staying with her mom that night, so he went over to sleep at her house. When Jackson got there, he saw that Lynch was home and

accused her of lying about staying at her Mom's. He left but came back around 2:30 a.m. Lynch was asleep, so he went to sleep on the basement couch.

Jackson planned to break up with Lynch later that day. That afternoon, they sat down to talk and work things out. Before they left Lynch's house, Lynch checked to see if the landlord was outside, then they both got in her car. They both got in through the driver's side because of how the car was parked; he got in first and sat in the passenger's seat, so he did not force her to get in the car.

Lynch was smoking marijuana in the car; Jackson told her that she should not stop at the first park she went to because it was near the Washburn University campus and police frequented the area. She pulled into the next park, and they talked for a little before Lynch said that she needed to meet her mom. So Jackson told her to drop him at a friend's house.

They then drove to another location. Once there, they argued about Lynch's marijuana use and about a message that Jackson had received from a woman he had dated on and off. Lynch took his phone, and he was trying to get it back. She threatened him with a knife, and they hit each other. He got out of the passenger seat and got into the driver seat, where the keys were still in the ignition, because he just wanted to drive himself to his friends and get away from Lynch.

Jackson started driving and Lynch attacked him with her knife. After getting cut on the arm he automatically reacted by hitting her on her face with the back of his hand. Her nose started bleeding. As he was driving, she began yanking the steering wheel and trying to veer off the road. Then as he slowed down to go through a roundabout, Lynch opened the door and tried to jump out of the car, so he grabbed her and started slowing down. She landed on two feet and was not being dragged. Then as Jackson was slowing down, Lynch lost her footing, fell, and hit her face on the way down. The car was stopped

5

at this point, and Jackson said, "Melissa that's crazy. Why would you do something like that?" Lynch got up, looked at him, and said, "[Y]ou dumb mother fucker," and then ran off to the car behind him.

After Jackson saw Lynch run to the car behind him and get in, he drove off. Jackson drove to the apartment complex they had been headed to. He left the car there with the keys inside because Lynch knew that was where the car would be.

*The jury convicted Jackson on three counts.*

The jury found Jackson guilty of aggravated kidnapping, aggravated battery, and criminal possession of a weapon. He was acquitted on all remaining counts.

The court found his criminal history score to be A—a finding which Jackson contested. The court sentenced him to 620 months in prison for the aggravated kidnapping, and concurrent sentences of 41 months in prison for aggravated battery, and 8 months in prison for criminal possession of a weapon.

In this direct appeal, Jackson raises four errors.

- His conviction for criminal possession of a weapon must be reversed because the Kansas Supreme Court held that the portion of K.S.A. 2019 Supp. 21-6304 prohibiting certain felons from possessing a knife is unconstitutionally vague;
- the prosecutor erred during his closing argument by vouching for Lynch's credibility and attacking Jackson's credibility;
- the district court committed reversible error when it refused to instruct the jury on kidnapping and criminal restraint—two lesser included crimes of aggravated kidnapping; and
- the district court erred in classifying three out-of-state offenses as person felonies when it calculated his criminal history score.

6

*We begin our analysis with the criminal possession of a knife charge.*

Jackson was convicted of criminal possession of a weapon under K.S.A. 2016 Supp. 21-6304 for possessing a knife. Our Supreme Court, in *State v. Harris*, 311 Kan. 816, 826, 467 P.3d 504 (2020), found that the definition of knife in that statute is unconstitutionally vague. A defendant receives the benefit of any change in the law that occurs while a direct appeal is pending. *State v. Murdock*, 309 Kan. 585, 591, 439 P.3d 307 (2019). This is Jackson's direct appeal, so we must reverse Jackson's conviction for criminal possession of a weapon. The State has conceded this point in its brief.

*We find no error in the prosecutor's closing argument.*

Jackson contends that the prosecutor impermissibly commented on Lynch's and Jackson's credibility during closing arguments. First, he complains about the prosecutor's statement that Jackson's testimony about reflexively striking Lynch was "simply not credible." And second, he complains about the prosecutor's statement during rebuttal that "it happened exactly the way Miss Lynch said it happened. Exactly the way she's always said that it happened. The State would submit that that's credible."

We will look first to decide whether the prosecutor's words fell outside the wide latitude afforded prosecutors to conduct the State's case. *State v. James*, 309 Kan. 1280, 1306, 443 P.3d 1063 (2019). If we find error, then the State must show "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" 309 Kan. at 1307.

Caselaw has established a rough continuum that allows us to gauge the effect of a prosecutor's argument. In general, prosecutors may not offer juries their personal opinions on the credibility of witnesses but have wide latitude to craft arguments that

include reasonable inferences to be drawn from the evidence. *State v. Sean*, 306 Kan. 963, 979-80, 399 P.3d 168 (2017). An example of a prosecutor who acted outside that wide latitude is found in *State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 (2005), where the prosecutor called the defendant a "liar" and stated in her closing argument that "the truth shows you beyond a reasonable doubt the defendant is guilty."

At the other end of the continuum, a prosecutor does not act outside the wide latitude afforded if he or she merely observes that some reasonable inference about witness credibility may be drawn from evidence introduced at trial. See *State v. Duong*, 292 Kan. 824, 831-32, 257 P.3d 309 (2011) (prosecutor's explicit comments about witnesses' credibility not improper because they were reasonable inferences based on the evidence at trial and prosecutor directed jury to that evidence); see also *State v. Sean*, 306 Kan. 963, 979-80, 399 P.3d 168 (2017).

Here, when we consider the statements in context, they fall within the wide latitude the law affords the prosecutor. Jackson's appellate brief cuts short the prosecutor's comments about Jackson's account of reflexively injuring Lynch. The prosecutor said that it was "simply not credible when you look at all of these—all these injuries on her body." Similarly, Jackson cut short the prosecutor's second set of comments: "What is sensible is it happened exactly the way Miss Lynch said it happened. Exactly the way she's always said that it happened. The State would submit that that's credible when you look at all of the evidence."

In each statement, the prosecutor was observing that some reasonable inference about witness credibility may be drawn from evidence introduced at trial. See *Duong*, 292 Kan. at 831-32. A prosecutor may do that. We hold the prosecutor here did not err during his closing argument.

8

*By not objecting to the district court refusing to give a criminal restraint jury instruction, Jackson has failed to preserve the issue for appeal, and we must examine the issue for clear error.*

The law is clear on this point. K.S.A. 2020 Supp. 22-3414(3) says: "No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires . . . unless the instruction or the failure to give an instruction is clearly erroneous." And in *State v. Pattillo*, 311 Kan. 995, 1013, 469 P.3d 1250 (2020), the Kansas Supreme Court said that "if the defendant did not make a contemporaneous objection to a jury instruction, appellate courts will review the claim of error for clear error." Our review of the record reveals a request for instructions by Jackson but no objection for failing to give them.

Jackson requested instructions on criminal restraint and kidnapping in his proposed instructions. The court then held an off-the-record instruction conference. The court would later explain that the conference was informal and that no final decisions were made.

> "The Court did conduct an off the record—although it was not an ex parte, because the defendant was present, all parties were present—informal draft jury instruction conference, which is not unusual or un-typical here in Shawnee County. And I don't think it's that un-typical in other courts as well. But the Court did pass out draft instructions, sought informal feedback from the parties. Clearly there was no court reporter sitting in front of the parties and the Court, and this was because no substantive decisions were being made by the Court during this conference. At no time were any final decisions made during that conference. I, as the judge, clearly and unequivocally informed the parties that we might have several rounds and drafts of possible instructions, jury instructions, during that conference, but that at the conclusion of that conference, the Court would provide the parties with the final proposed instructions, on the record, and both parties would have full opportunity to object, make requests, suggestions, et cetera."

The court then held an on-the-record conference during which the instructions were completed. The court presented its proposed instructions—which included only aggravated kidnapping—to the parties and gave each a chance to object; neither party did:

> "This is the conclusion or the finalization of a jury instruction hearing in this case. The Court has presented proposed jury instructions to the State and to the defense and are there objections to those proposed instructions from the State?
> "MR. WATSON: None from the State.
> "THE COURT: From the defense?
> "MR. KJORLIE: No, Your Honor.
> "THE COURT: Okay. So those are the proposed instructions the Court will use. The parties have been given copies and are aware of those."

Then, after the court instructed the jury, it again allowed the parties to object; neither party did so.

We think *State v. Brammer*, 301 Kan. 333, 341, 343 P.3d 75 (2015), controls this point.

> "Based on K.S.A. 22-3414(3) . . . , we hold that an attorney must object on the record to the giving or omission of an instruction before the jury retires to consider the verdict, with counsel clearly stating the reason for the objection. It is not sufficient to simply have filed proposed instructions before trial to preserve a later challenge under our general framework for reviewing jury instructions on appeal."

Even though Jackson had submitted proposed instructions for criminal restraint and kidnapping to the court, he did not take the next step and object to the court not giving them. By failing to do so, he failed to perfect the issue for appeal, and we will examine the claim for clear error.

10

*We hold that Jackson has not shown that the jury would have reached a different verdict if the trial court had given a kidnapping instruction and a criminal restraint instruction.*

Jackson contends that a kidnapping instruction and a criminal restraint instruction—both lesser included offense instructions—were factual and legally appropriate. But his burden is to show us that the jury would have reached a different verdict had the two instructions been given. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018). He has not met that burden.

To analyze this properly we must draw inferences from the facts. Under K.S.A. 2020 Supp. 22-3414(3), a district court has an obligation to instruct the jury on lesser included crimes if there is "some evidence which would reasonably justify a conviction" on those offenses.

> "'The evidence of a lesser included offense need not be strong or extensive as long as it presents circumstances from which the lesser offense might reasonably be inferred. Such an instruction must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant. [Citations omitted.]" *State v. Horn*, 278 Kan. 24, 39-40, 91 P.3d 517 (2004), *overruled on other grounds by State v. Neighbors*, 299 Kan. 234, 328 P.3d 1081 (2014).

We will examine the question of kidnapping and aggravated kidnapping first.

Kidnapping is defined as the taking or confining of a person

> "with the intent to hold such person: (1) For ransom, or as a shield or hostage; (2) to facilitate flight or the commission of any crime; (3) to inflict bodily injury or to terrorize the victim or another; or (4) to interfere with the performance of any governmental or political function." K.S.A. 2020 Supp. 21-5408(a)(1)-(4).

Finally, aggravated kidnapping is a kidnapping during which "bodily harm is inflicted upon the person kidnapped." K.S.A. 2020 Supp. 21-5408(b).

There is no doubt of bodily harm here. Lynch's nose was broken in two places. Her cheekbone was broken. One of her eyes was swollen shut. One of her legs was broken and she had pavement scrapes and a big gash on her head. With this record we see no evidence that could reasonably justify a conviction of kidnapping but not aggravated kidnapping. The only difference between those two offenses is that the defendant inflicts bodily harm on the victim. Jackson's own testimony established that he hit Lynch with the back of his hand causing her nose to bleed, that at another point during the ride they were hitting each other, and that Lynch had a gouge on her eye because he was pushing her against the passenger door. So there is no evidence a reasonable juror could rely on to conclude that Jackson did not inflict bodily harm on Lynch. A kidnapping instruction was therefore not factually appropriate. There is no clear error here. We turn to the issue of criminal restraint.

We must focus on Jackson's intent to determine the answer to this question. Criminal restraint is defined as "knowingly and without legal authority restraining another person so as to interfere substantially with such person's liberty." K.S.A. 2020 Supp. 21-5411. To prove kidnapping, the State had to show that Jackson had confined Lynch with the intent to either hold her to facilitate the commission of a crime, to inflict bodily injury upon her, or to terrorize her. But Jackson testified that he had no intention to place Lynch in fear. He also testified that he reflexively hit Lynch when she attacked him with a knife and that he had not intended to hit her. If the jury believed those statements, it could have found that Jackson did not intend to injure or terrorize Lynch, even if he did confine her, and a criminal restraint instruction would have been factually appropriate.

12

But even if we found this failure to give a criminal restraint instruction to be error, we are not convinced that it is clear error. This jury's verdict makes it clear that it did not believe Jackson's version of the events. Lynch detailed her long ordeal of confinement, beating, and bodily harm. Jackson's testimony that he did not intend to terrorize Lynch diverges from her testimony, and the jury accepted Lynch's version of the events. Jackson's testimony that he accidently or reflexively injured Lynch also contradicts her testimony and the evidence of the severity and extent of her injuries. Jackson has not met his burden to show this was clear error.

Jackson is not entitled to the reversal of his aggravated kidnapping conviction because the trial court failed to give a criminal restraint instruction.

*The parties agree that the district court made an error in calculating Jackson's criminal history score.*

We are concerned here with the district court's handling of three of Jackson's prior convictions—a federal conviction in Kansas for interference with commerce by robbery, a Minnesota conviction for second-degree burglary, and a Minnesota conviction for terroristic threats. The court scored each of those as a person felony, and it calculated Jackson's criminal history score as A—the highest score in our sentencing guidelines. Jackson objected to his criminal history score in the district court, so he has preserved his challenge.

Jackson argues that his criminal history score is incorrect because his federal and second-degree burglary convictions should have been scored as nonperson felonies, and his terroristic threat conviction either should not have been included for calculating his criminal history score or it, too, should have been scored as a nonperson felony.

There was a dispute in the district court about whether to apply the ruling in *State v. Wetrich*, 307 Kan. 552, 412 P.3d 984 (2018), or K.S.A. 2019 Supp. 21-6811(e) to determine how to classify Jackson's convictions. The court applied K.S.A. 2019 Supp. 21-6811(e), and the State now concedes that was wrong. The State agrees with Jackson and says we should apply the *Wetrich* ruling because the statutory amendments became effective after Jackson committed his offenses and was convicted.

Under the law in effect at that time, when a district court classified a defendant's out-of-state conviction as a person or nonperson felony, the court compared that offense to a comparable one in effect in Kansas on the date the defendant committed the current crime of conviction. K.S.A. 2018 Supp. 21-6811(e)(3). Under *Wetrich*, "[f]or an out-of-state conviction to be comparable to an offense [in Kansas], . . . the elements of the out-of-state crime must be identical to, or narrower than, the elements of the [comparable] Kansas crime. . . ." 307 Kan. 552, Syl. ¶ 3. If there was no comparable offense, the court had to classify a conviction as a nonperson crime. K.S.A. 2018 Supp. 21-6811(e)(3).

The State concedes that Jackson is correct. His federal robbery and Minnesota second-degree burglary convictions are both broader than the comparable Kansas offenses. Under 18 U.S.C. § 1951(b)(1) (2016), a person can commit robbery by taking property through a threat to other property; the Kansas robbery statute, K.S.A. 2020 Supp. 21-5420(a), limits robberies to taking property by force or threat of bodily harm.

And under the Minnesota burglary statute, Minn. Stat. § 609.582, a person can commit burglary by unlawfully entering a dwelling with the "intent to commit a crime." The Kansas burglary statute, K.S.A. 2020 Supp. 21-5807(a)(1), limits burglaries to unlawful entries of dwelling with the "intent to commit a felony, theft or sexually motivated crime inside." So, each out-of-state statute prohibits a broader range of activity than the comparable Kansas statute. The district court therefore should have classified these convictions as nonperson felonies.

14

We turn to Jackson's Minnesota terroristic threat conviction. Jackson first contends that the district court should have excluded the conviction when calculating criminal history. He relies on K.S.A. 2020 Supp. 21-6810(d)(9), which prohibits a district court from using a prior conviction for a crime "that has since been determined unconstitutional by an appellate court" to calculate criminal history. He contends that since our Supreme Court found a portion of a materially identical Kansas statute unconstitutional in *State v. Boettger*, 310 Kan. 800, 450 P.3d 805 (2019), K.S.A. 2020 Supp. 21-6810(d)(9) prohibits the court from using it for criminal threat purposes. That provision does not apply, however, since no appellate court, whether in Kansas or Minnesota, has found Minn. Stat. § 609.713.1 to be unconstitutional.

As an alternative argument, Jackson contends that the terroristic threat conviction should be classified as a nonperson crime. He is correct. Under *Boettger*, a person cannot commit a criminal threat in Kansas if the threat of violence is made in reckless disregard for causing fear because that portion of the statute is unconstitutionally overbroad. 310 Kan. at 823. But under Minn. Stat. § 609.713.1, a person can be convicted for making a threat in reckless disregard. So the Minnesota offense is broader than the Kansas offense. Jackson's terroristic threat conviction should therefore be classified as a nonperson crime.

The State tries to avoid this result by insisting that the criminal history score must stem from the laws in place when the offender commits the crime of conviction. See *State v. Keel*, 302 Kan. 560, 589-90, 357 P.3d 251 (2015). Since *Boettger* had not been decided when Jackson committed his crime, the State contends that the court must compare the Minnesota terroristic threat statute to the Kansas criminal threat statute as it existed at that time.

A defendant receives the benefit of any change in the law that occurs while the direct appeal is pending. *Murdock*, 309 Kan. at 591. This is Jackson's direct appeal.

15

*Boettger* was decided while this appeal was pending. Jackson is therefore entitled to the benefits of the *Boettger* ruling.

*Our ruling*

We affirm Jackson's convictions for aggravated kidnapping and aggravated battery. We reverse his conviction for criminal possession of a weapon. We vacate his sentence and remand the case to the district court for the redetermination of his criminal history score and resentencing in accordance with this opinion.

Affirmed in part, reversed in part, sentence vacated, and case remanded with directions.

\* \* \*

ATCHESON, J., concurring:  I generally share my colleagues' views as to the disposition of Defendant Jesse J. Jackson Jr.'s case, save for the last issue—how to handle his past conviction for a threat of violence under Minn. Stat. § 609.713.1 in compiling his criminal history for sentencing purposes. I agree the conviction cannot be scored as a person felony, so the Shawnee County District Court erred in doing so. Especially coupled with the other mistakes overstating Jackson's criminal history, that leads to a substantial reduction in the presumptive guideline sentence Jackson faces for aggravated kidnapping, as the primary crime of conviction.

But I am not convinced the Minnesota threat of violence conviction should be treated as a nonperson felony. There is a plausible, if twisty, argument potentially leading to the conviction being discarded.[1]

[1]Having examined Minn. Stat. § 609.713.1 and the comparable Kansas crime of criminal threat codified in K.S.A. 21-5415(a), I would presume for purposes of this

16

discussion that they functionally proscribe the same bad conduct. The statutory language is not identical, so I might be persuaded by some clever legal wordplay that they are different. But we haven't been presented with such arguments in this case. And I don't see any glaring differences. Both statutes criminalize intentional threats and threats made recklessly.

The Kansas Supreme Court has held the portion of K.S.A. 21-5415(a) proscribing reckless threats to be facially overbroad and, thus, incompatible with the First Amendment to the United States Constitution. *State v. Boettger*, 310 Kan. 800, 822-23, 450 P.3d 805 (2019), *cert. denied* 140 S. Ct. 1956 (2020). Under the sentencing guidelines, a defendant should not have a conviction included in his or her criminal history if the "statute has since been determined unconstitutional by an appellate court." K.S.A. 21-6810(d)(9). So had Jackson been convicted of violating K.S.A. 21-5415(a), we would have to remand the case to the district court to determine if the conviction rested on a reckless threat or an intentional threat.

The language of K.S.A. 2020 Supp. 21-6810(d)(9) would appear to allow us, as an appellate court, to rule on the constitutionality of Minn. Stat. § 609.713.1 for purposes of determining Jackson's criminal history. Our determination presumably ought to abide any definitive construction the Minnesota Supreme Court has given to the statutory language. And our conclusion would, of course, have no binding effect in Minnesota. If we took that step and borrowed the rationale of *Boettger*, we would find a conviction for a reckless threat of violence under Minn. Stat. § 609.713.1 to be unconstitutional and, therefore, improperly counted in a defendant's criminal history. In turn, on remand, we should require the district court to determine if Jackson had been convicted for a reckless threat violation of Minn. Stat. § 609.713.1. If so, the conviction should not be counted in determining Jackson's criminal history.

The record on appeal, however, strongly suggests it does not matter whether Jackson's Minnesota threat of violence conviction is discarded or treated as a nonperson felony because his criminal history appears to include at least three other nonperson felonies that would place him in criminal history category E anyway. The district court concluded Jackson fell in criminal history category A based on convictions for three person felonies. The State has conceded two of those convictions—the federal conviction for robbery and the Minnesota conviction for burglary—should be scored as nonperson felonies. And we agree the threat of violence conviction cannot be a person felony for criminal history purposes under *State v. Wetrich,* 307 Kan. 552, Syl. ¶ 3, 412 P.3d 984 (2018), because Minn. Stat. § 609.713.1 is broader than K.S.A. 21-5415(a) since

17

*Boetteger* rendered the Kansas statute unenforceable against recklessly made criminal threats.[2]

[2]Although we may have a limited authority under K.S.A. 2020 Supp. 21-6810(d)(9) to "determine" Minn. Stat. § 609.713.1 to be unconstitutional for the sole purpose of assessing Jackson's criminal history, we cannot declare another state's statute unconstitutional or unenforceable as a matter of first impression in making the comparison required under *Wetrich*. Whether an out-of-state statute criminalizes a broader range of conduct than the comparable Kansas statute turns on how the statute has been construed and applied in that jurisdiction. That is, any determination we might make under K.S.A. 2020 Supp. 21-6810(d)(9) would not render Minn. Stat. § 609.713.1 the same as or narrower than K.S.A. 2020 Supp. 21-5415(a) for purposes of *Wetrich* comparability. Therefore, even if Jackson had been convicted of an intentional threat of violence in Minnesota, the conviction could not be scored as a person felony for criminal history purposes in this case.

Although the presentence investigation report shows Jackson has 17 past adult convictions for an array of felonies and misdemeanors, none of them appears to be a person felony. So his criminal history cannot fall in categories A through D, all of which require at least one conviction for a person felony. Defendants with three or more nonperson felony convictions (but no person felonies) earn a place in criminal history category E. Based on the appellate record and our decision today, Jackson appears to have either four or five nonperson felonies, depending on whether his conviction under Minn. Stat. § 609.713.1 counts.

On remand, the district court ought to determine if Jackson otherwise has three nonperson felonies in his criminal history. If that's true, then the district court would have no need to assess how the Minn. Stat. § 609.713.1 conviction should be treated for criminal history purposes. It becomes legally superfluous. I offer that as the path of least resistance and, thus, a preferred option.